# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GOLDEN RULE FINANCIAL CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 2022-0065-PAF |
| SHAREHOLDER REPRESENTATIVE SERVICES LLC, | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: August 4, 2025
Date Decided: April 30, 2026

Joseph C. Schoell, Oderah C. Nwaeze, Renée M. Dudek, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Randall E. Kahnke, Peter C. Magnuson, Michael J. Kaupa, Hannah M. Leiendecker, Anderson C. Tuggle, FAEGRE DRINKER BIDDLE & REATH LLP, Minneapolis, Minnesota; *Attorneys for Plaintiff Golden Rule Financial Corporation*

David E. Ross, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Erin C. Johnston, Kasdin M. Mitchell, Yaffa A. Meeran, Austin J. Del Priore, KIRKLAND & ELLIS LLP, Washington, D.C.; Mary T. Reale, KIRKLAND & ELLIS LLP, New York, New York; *Attorneys for Defendant Shareholder Representative Services LLC*

FIORAVANTI, Vice Chancellor

This post-trial decision resolves claims for breach of representations and warranties in a merger agreement. The buyer alleges the seller misrepresented that its financial statements were accurate and in compliance with generally accepted accounting principles. Specifically, the buyer contends that the seller represented that it had adopted an accounting standard (ASC 606), which dictates how certain revenue is recognized, but misapplied that standard. As a result, the buyer claims it suffered an indemnifiable loss of more than $38 million, which it was required to pay to the seller in a post-closing purchase price adjustment dispute.

The seller contends that the buyer has not established a breach of contract on the merits and that the buyer's claims are barred under the doctrine of *res judicata* and the merger agreement's indemnification limitations. The court concludes that the buyer's claims are not barred under either of the seller's theories and that the buyer has prevailed on its breach of contract claims.

## I. BACKGROUND

These are the facts as the court finds them after trial.[1]

---

[1] Other factual findings are contained in the analysis of the claims. Deposition testimony is cited as "(Surname) Dep."; trial exhibits are cited as "JX"; stipulated facts in the pre-trial order are cited as "PTO"; and references to the docket are cited as "Dkt.," with each followed by the docket number and the relevant section, page, paragraph, or exhibit. Citations to testimony presented at trial are in the form "Tr. # (X)," with "X" representing the name or surname of the speaker. Citations to the transcript of post-trial oral argument (Dkt. 161) are in the form of "Post-Trial Arg." After being identified initially, individuals are referenced herein by their surnames. Unless otherwise indicated, citations to the

## A. The Parties and the Merger Agreement

Golden Rule Financial Corporation ("Golden Rule" or the "Plaintiff"), a Delaware corporation, is a health-insurance provider and an indirect, wholly owned subsidiary of UnitedHealth Group, Incorporated ("UHG").[2]

USHEALTH Group, Inc. ("USHEALTH" or the "Company"), a Delaware corporation, directly or indirectly owns several insurance companies and other entities.[3] NEXT Investors USHG, LLC ("NEXT"), a private equity investment fund, was USHEALTH's controlling stockholder.[4]

---

parties' briefs are to post-trial briefs. When resolving factual disputes, this decision generally gives more weight to contemporaneous evidence. *See Lynch v. Gonzalez*, 2020 WL 4381604, at *5 (Del. Ch. July 31, 2020) ("The relative weight given to any particular piece of evidence, and particularly witness testimony, is a matter for the court to determine as the trier of fact." (citation modified)), *aff'd*, 253 A.3d 556 (Del. 2021) (TABLE); *see also BCIM Strategic Value Master Fund, LP v. HFF, Inc.*, 2022 WL 304840, at *2 (Del. Ch. Feb. 2, 2022) ("The witness testimony often conflicted with the contemporaneous record. In resolving factual disputes, this decision generally has given greater weight to the contemporaneous documents.").

[2] PTO ¶ 2; Tr. 7:14–16 (Hunter). At the time of trial, Bobby Hunter was the Senior Vice President for Medicare Advantage product and experience at UHG.

[3] PTO ¶ 4; JX 19 at 8, 13; JX 33 at 22 ("The Company consists of 16 legal entities[.]").

[4] JX 19 at 8, 13, 147; JX 183 at 15; JX 236; Grimaldi Dep. 15:19–25. NEXT was controlled and managed by Credit Suisse Asset Management. Grimaldi Dep. 8:8–12; Abbassi Dep. 179:6−8; JX 105 at 2. NEXT acquired the controlling share from another Credit Suisse Asset Management affiliate in 2014. JX 246 at 9; Grimaldi Dep. 15:19–21; JX 183 at 28; Tr. 847:24−848:4 (Abbassi). Rajab Abbassi is a partner at Kirkland & Ellis LLP and was one of the lead attorneys representing USHEALTH in the transaction. *Id.* at 844:24–845:12.

Shareholder Representative Services LLC ("SRS" or the "Defendant") is a Colorado limited liability company.[5]  SRS is the representative agent and attorney-in-fact of the former stockholders and award holders of USHEALTH.[6]

In 2019, Golden Rule acquired USHEALTH in a merger (the "Merger").  The terms of the Merger are memorialized in an agreement and plan of merger (the "Merger Agreement") dated as of June 2, 2019.[7]

### B.    USHEALTH's Business and the Relevant Accounting Standards

USHEALTH operated primarily as a provider of individual healthcare insurance, while also engaging in non-insurance operations.[8]  Those non-insurance operations consisted principally of selling association memberships to purchasers of USHEALTH insurance products and were part of USHEALTH's unregulated business.[9]

---

[5] PTO ¶ 3.

[6] *Id.*

[7] JX 161.

[8] Tr. 9:7−10 (Hunter); JX 19 at 124.  *See* JX 33 at 21.

[9] Tr. 288:8−11 (Easton); JX 246 ¶ 18 ("Purchase of an association membership is a requirement in order to access the Company's core insurance products in 18 out of the 30 states in which the company operates."); *see also* JX 19 at 28, 48 (indicating that, in 18 states, customers were required to be members of the association in order to purchase USHEALTH products).  Peter Easton is the Notre Dame Alumni Professor of Accountancy and Director of the Center for Accounting Research and Education at the Mendoza College of Business, the University of Notre Dame.  JX 247 ¶ 1.  Easton served as Golden Rule's expert on ASC 606.  *Id.* ¶ 16.

USHEALTH's regulated insurance subsidiaries reported under statutory accounting principles.[10] By contrast, generally accepted accounting principles ("GAAP") governed material items within the Company's unregulated business (*i.e.*, non-insurance contracts).[11] By 2018, revenues generated by subagents selling memberships and certain associations, together with the corresponding commission expenses, had become material after approximately doubling from 2016 levels.[12] That materiality triggered the application of Accounting Standards Codification Topic 605 – Revenue Recognition ("ASC 605") to those association-related revenues.[13]

---

[10] JX 19 at 116.

[11] Under ASC 105, the application of GAAP is reserved for items material to the financial statements. ASC 105-10-05-6, *General Principles* ("The provisions of the Codification need not be applied to immaterial items."); Tr. 491:4–9 (Flemmons) ("[T]here's a provision in ASC 105 that specifically carves out transactions that are immaterial to the financial statements. Q. So does GAAP apply to immaterial items? A. It does not."); *see also* Tr. 504:9−20 (Flemmons); *id.* at 21:17–20 (Hunter). Jason Flemmons is a Senior Managing Director in the Investigations and Accounting Advisory practice of Ankura Consulting Group, LLC, and served as an expert for SRS on ASC 606. JX 191 ¶¶ 1, 5, at 6 § II.

[12] Tr. 668:9−23 (Jacobs); JX 137 at 13; JX 246 ¶ 18; Tr. 288:4–11 (Easton); JX 247 ¶ 24 ("[ASC 606] does not apply to revenue recognition for insurance contracts, including life and health insurance, property and liability insurance, title insurance and mortgage guarantee insurance. ASC 606 does apply, however, to contracts offered by insurance companies (either separately or bundled with insurance contracts) that do not provide insurance services, including the membership agreements sold by USHEALTH's Unregulated Companies."); *see also* Tr. 721:24−722:16 (O'Neill) (analogizing the association revenue generated by USHEALTH to the revenue stream generated by HealthMarkets).

[13] Tr. 288:4–7 (Easton) (indicating that neither ASC 605 nor ASC 606 applies to revenue from insurance contracts).

4

Under ASC 605, association dues revenue was recognized under an accrual model.[14]  Revenue was recognized once it was realized, or realizable and earned.[15] If a company received payment before rendering the membership services, it recorded a liability, such as unearned revenue.[16]  Once the service was performed, the company recognized the revenue.[17]  If a company rendered the service before receiving payment, it recorded an asset, such as an account receivable.[18]

On May 28, 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update No. 2014-09, which introduced Accounting Standards Codification Topic 606 – "Revenue from Contracts with Customers" ("ASC 606").[19]  ASC 606 retained an accrual model, but replaced legacy revenue

---

[14] *Id.* at 492:5−20, 499:11–12 (Flemmons) ("ASC 605, like the rest of GAAP, is an accrual basis convention."); *id.* at 491:19–492:4.

[15] ASC 606-10-S65-01; JX 247 ¶ 29 & n.42; JX 191 ¶¶ 20−21, 26; Easton Dep. 50:18–51:4; Tr. 492:18–20 (Flemmons).

[16] JX 247 ¶ 23.

[17] *Id.*

[18] *Id.*

[19] Tr. 493:7–11 (Flemmons); JX 247 at 10; *id.* ¶ 24 ("One important goal of the new revenue guidance was to clarify the vagueness of legacy GAAP regarding the timing at which a company meets its performance obligations, and thus the timing at which it earns the right to recognize revenue.  For companies with multiple deliverables or when revenue is earned over time (e.g., subscription services), the new revenue recognition standard often results in a change in the timing of when revenue is recognized relative to legacy GAAP.").  The Financial Accounting Standards Board ("FASB") establishes standards for financial accounting and reporting.  JX 191 ¶ 19.  FASB issues Accounting Standard Updates ("ASUs") to update, clarify, or improve existing accounting standards, ensuring that financial reporting provides useful information to investors and other users of financial statements.  ASC 105-10-05-05, *General Principles*; JX 191 ¶ 20.

recognition guidance with a unified, principles-based framework focused on the transfer of control.[20] Under ASC 606, revenue is recognized when a company transfers control of a service to the customer, in an amount that reflects the consideration the company expects to receive.[21]

For private companies, ASC 605 became mandatory for annual reporting periods beginning after December 15, 2018, and interim reporting periods beginning

---

[20] Easton Dep. 46:10–14; JX 156 at 3 ("*Transfer of control model*. Under ASC 606, revenue is recognized when (or as) each performance obligation is satisfied by the entity, which is when control of the underlying good(s) or service(s) is transferred to the customer."); *see also* JX 247 ¶ 22 ("ASC 606 uses a five-step model for revenue recognition: (1) identify the contract; (2) identify separate performance obligations; (3) determine the transaction price; (4) allocate the transaction price; and (5) recognize revenue when (or as) the performance obligations are satisfied.").

[21] JX 247 ¶ 22; *see* JX 229 at 2 ("'Control' refers to the customer's ability to direct the use of, and obtain substantially all of the remaining benefits from, an asset."); *id.* at 2 ("An entity recognizes revenue when or as it satisfies a performance obligation by transferring a . . . service to a customer, either at a point in time (when) or over time (as). A . . . service is 'transferred' when or as the customer obtains control of it."); Tr. 493:7–11 (Flemmons). ASC 606 allowed adoption by either the retrospective or modified retrospective method. Flemmons Dep. 159:13–160:10. The retrospective method required restating prior periods as if ASC 606 had always applied. Tr. 664:17–20 (Jacobs); Easton Dep. 63:16–21. The modified method applied the new standard only to the current period, with a cumulative adjustment to opening retained earnings. Tr. 297:5–21 (Easton); Easton Dep. 63:22–24.

after December 15, 2019.[22]  Until then, ASC 605 continued to govern unless the entity elected to early adopt ASC 606 for interim reporting periods.[23]

## C.    The Auction Process

NEXT periodically evaluated strategic alternatives for USHEALTH, including a sale of the Company.[24]  In July 2018, USHEALTH began actively exploring a sale.[25]  The Company engaged Goldman Sachs & Co. LLC ("Goldman Sachs") as its investment bank and financial adviser.[26]  An attorney initially at Willkie Farr & Gallagher LLP ("Willkie") and later at Kirkland & Ellis LLP led the legal team.[27]

---

[22] ASC 606-10-S65-01; JX 247 ¶ 29 & n.42; JX 191 ¶ 20; Tr. 492:24–493:6 (Flemmons) ("ASC 605 was largely an aggregation of many different standards that were issued by a variety of different standard setters.  There was revenue-recognition guidance in various places from the FASB, from AICPA's standard section, from task forces.  And ASC 605 sought to aggregate all of that into one codified standard."); *see also id.* at 494:3−13 (outlining timeline for private companies); *id.* at 492:5−20, 495:6−8 (Flemmons); JX 156 at 3; JX 191 ¶ 45; JX 247 ¶ 23; JX 252 at 1; JX 268 at 13; JX 271 at 1, 11−12, 25.

[23] JX 7 § 10-65-1(b)(1).

[24] Grimaldi Dep. 16:15–18; Simpson Dep. 17:19–25; McQuagge Dep. 26:23–27:1; Tr. 772:11–19 (O'Neill).  Greg Grimaldi is a managing director at Goldman Sachs. Grimaldi Dep. 13:5–6.  Joshua Simpson is a managing director at Goldman Sachs. Simpson Dep. at 9:17–20.  Troy McQuagge was the President and Chief Executive Officer of USHEALTH Advisors, and is the chief executive officer of USHEALTH.

[25] Tr. 257:23–258:13 (McQuagge); *id.* at 708:24–709:2 (O'Neill).  In 2018, the Company signed an engagement letter with Goldman Sachs.  Simpson Dep. 18:1–6; *see also* Tr. 710:2–10 (O'Neill) (explaining that the rapid growth in revenue and profitability, which supported strong projections, made USHEALTH an attractive acquisition target).

[26] PTO ¶ 6; JX 18 at 7; Tr. 773:7–10 (O'Neill); *id.* at 848:12–13 (Abbassi).

[27] Tr. 12:12–15 (Hunter); Abbassi Dep. 96:18–25.

The auction process proceeded in three rounds. In late September 2018, Goldman Sachs contacted 87 potential bidders.[28] Fifty of them executed non-disclosure agreements and received a confidential information memorandum.[29] Between October and November 2018, nine parties submitted indicative offers, and six presented to management.[30] In December 2018, four parties submitted second-round bids.[31] Golden Rule and Kemper Corporation ("Kemper") advanced to the third round.[32] Goldman Sachs and Willkie provided feedback to both bidders and requested revised proposals and merger agreements by January 14, 2019.[33] Goldman Sachs presented Golden Rule's and Kemper's third-round conforming bids to the Company's board of directors (the "Board") on January 16, 2019.[34] After that

[28] Tr. 711:3−11 (O'Neill); *id.* at 851:3–8 (Abbassi).

[29] *Id.* at 711:3−11 (O'Neill); JX 19; JX 24 at 1; JX 40 at 3–4; Tr. 851:10–852:14 (Abbassi); Grimaldi Dep. 59:16–20. The confidential information memorandum provided prospective bidders with an overview of USHEALTH's business operations, financial performance, growth strategy, and market positioning. JX 19.

[30] JX 40 at 3; Tr. 258:14–21 (McQuagge).

[31] JX 246 at 12; McQuagge Dep. 29:1–8; JX 29 at 3; JX 40 at 6; Tr. 773:17–21 (O'Neill).

[32] JX 40 at 10; Abbassi Dep. 343:20–344:9; Tr. 258:22–259:8 (McQuagge); *id.* at 11:7−18 (Hunter); *id.* at 774:8–777:15 (O'Neill); JX 40 at 6.

[33] JX 50 at 1; JX 53 at 3; JX 62 at 5; JX 68; JX 166 at 237−239.

[34] JX 49 at 4−10. The offer size of $700 million was the same for both bidders. The differences related, among others, to (i) the number of diligence requests each party expected to require; (ii) the source and type of the bidder's financing; (iii) the level of favor accorded to the Company in the legal markup, and (iv) the presence or absence of equity rollover requirements. JX 49 at 4−10; Tr. 777:16–23 (O'Neill); JX 40 at 6.

meeting, Goldman Sachs provided feedback, and both bidders submitted revised proposals.[35]

On January 24 and February 19, 2019, Goldman Sachs updated the Board on the revised proposals.[36] Kemper's proposal implied a valuation of approximately $745 million, combining cash, a fully committed bridge facility of up to $625 million, and a minimum of 35% equity rollover requirement for key management and agents.[37] Kemper proposed a "walkaway" deal, with representations and warranties expiring at closing and no post-closing indemnification rights.[38] Golden Rule offered $750 million in cash with no financing contingency. Unlike Kemper, Golden Rule sought post-closing indemnification for breaches of representations and covenants.[39]

Goldman Sachs also reported progress on Golden Rule's proposed purchase price adjustment structure. Goldman Sachs informed the Board that Golden Rule

---

[35] Tr. 713:6–13, 779:1–783:12 (O'Neill); JX 62 at 4, 6.

[36] JX 62; JX 166 at 232−236; JX 85; JX 86.

[37] JX 62 at 6 ("Key management and agents to sign retention agreements with a minimum of 35% of employee/agent's closing proceeds rolled over."); *id.* at 11 ("37 members of management would roll over either 35%, 50%, or 60% of a pre-tax basis."); Abbassi Dep. 415:15−18 ("[The 37 members of management] would get some cash, but they would have to rollover some portion of their ownership interest into shares."); *id.* at 346:15−18 ("[E]ven if the sources were 100 percent accounted for by the bridge facility, you would have to assume that the bridge facility will ultimately be there.").

[38] Tr. 913:24−914:8 (Abbassi); *see generally* Abbassi Dep. 382:15–388:2 (comparing specific terms and explaining that Kemper's markup "was more favorable to a seller").

[39] JX 166 at 233−235.

had provided details on its proposed purchase price adjustment construct, that Goldman Sachs and USHEALTH were evaluating it, and that Goldman Sachs would discuss open questions with Golden Rule before drafting the pertinent contractual language.[40] Goldman Sachs also reported that the USHEALTH team had closed out most outstanding diligence items, with six remaining open.[41]

After receiving Goldman Sachs's and Willkie's comparative evaluation and advice, the Board unanimously approved a resolution to advance the sale process with Golden Rule.[42] Goldman Sachs then urged Golden Rule to improve its economics, recommending that Golden Rule increase its offer to $770 million and explaining that its contractual markup was materially behind others'.[43]

### D. Golden Rule's Diligence Regarding ASC 606

#### 1. Golden Rule's diligence team and focus

Golden Rule engaged Faegre Drinker Biddle & Reath LLP ("Faegre") as external counsel[44] and PricewaterhouseCoopers LLP ("PwC") for financial due

---

[40] JX 68 at 2.

[41] *Id.*

[42] PTO ¶ 5; Tr. 914:9−16 (Abbassi); *see* JX 49; JX 85; JX 86 at 3; JX 161; JX 166 at 236; Tr. 259:9–20 (McQuagge) (expanding on the reasons to opt for Golden Rule); *see also id.* at 892:16–893:3 (Abbassi) (indicating that Kemper's lawyers and deal team continued to signal their interest in the deal even afterward); McQuagge Dep. 29:9–10. Goldman Sachs informed Kemper "that the Board [had] made a difficult decision to move in a different direction." JX 68 at 1.

[43] JX 68 at 1.

[44] Hunter Dep. 228:3–14.

diligence.[45] Golden Rule viewed USHEALTH as a strong-performing health insurance business that would add earnings, expand membership, and support future scale within its portfolio.[46] Golden Rule began its initial financial due diligence process in November 2018.[47] During that period, Faegre continued working on the Merger Agreement.[48]

One focus of Golden Rule's diligence was the Company's adoption of ASC 606 and its effect on the unregulated business.[49] A November 19, 2018, internal memorandum summarized Golden Rule's review of the Company's initial diligence materials.[50] The memorandum noted that USHEALTH generated fee and service revenue from renewal commissions on prior-year sales of affiliated and

---

[45] PTO ¶ 7; JX 452; Downey Dep. 18:14–22 (describing the scope of PwC's engagement). Andrew Downey is a partner at PricewaterhouseCoopers LLP. Tr. 106:24−107:10 (Downey).

[46] Tr. 10:15–22 (Hunter).

[47] *Id.* at 13:9–19, 15:4−23. On November 2, 2018, Golden Rule established its diligence team. *See* JX 29; Tr. 101:19−23 (Downey).

[48] *See, e.g.*, JX 50.

[49] JX 51 at 1; JX 52; *id.* at SRS00015353. Golden Rule monitored its due diligence through an information tracker. JX 33 at 2. Upon receipt of the information, Golden Rule would review and mark the item as closed on its diligence tracker once comfortable with the response. Tr. 828:4–10 (Nessa); *see also* JX 42 at 2−3 (referring to Golden Rule's diligence review between December 23 and December 26, 2018); JX 53 at 4 ("[Golden Rule] has expressed that in addition to the 97 business / potentially material due diligence questions it is focused on in this stage, it has ~180 confirmatory due diligence questions that it will also likely seek resolution on before signing[.]"). Abby Nessa was an analyst in the corporate development team at UHG. Tr. 826:24–827:5 (Nessa).

[50] JX 33.

unaffiliated insurance products, as well as from commissions on the sale of unaffiliated membership benefit programs. It further noted that, upon acquisition, USHEALTH would be required to apply ASC 606 for UHG financial reporting; that USHEALTH's insurance products would remain outside the scope of ASC 606 and continue to follow existing insurance guidance; and that financial models for the agency business should reflect the expected impact of immediate ASC 606 adoption upon acquisition.

On December 8, 2018, USHEALTH concluded internally that ASC 606 would affect its recognition of association dues and administrative fee revenue, requiring the Company to record unearned association dues and administrative fee revenue at each month-end.[51] During this period, Golden Rule requested the Company's "ASC 606 analysis."[52] Emails exchanged on December 18, 2018, between Golden Rule and PwC show that Golden Rule was still evaluating two possible approaches to the purchase price adjustment: the consolidated GAAP approach proposed by USHEALTH and a statutory capital approach as a buyer-proposed alternative.[53]

---

[51] JX 36.

[52] JX 38 at 1.

[53] JX 39.

## 2. The Revenue Recognition Memo

On January 10, 2019, in response to a diligence request, USHEALTH's Chief Financial Officer, Cindy Koenig, provided Goldman Sachs with a file titled "USHEALTH ASC 606 Memo – Revenue Recognition – Association Revenues," dated November 2, 2018 (the "Revenue Recognition Memo").[54] The Revenue Recognition Memo stated that "[t]he Company will adopt a retrospective approach as of January 1, 2019, recording an unearned association revenue liability, a prepaid association bonus expense asset, and an adjustment to retained earnings. Proper footnote disclosure will be developed for compliance with ASC 606."[55]

The Revenue Recognition Memo was the first document Golden Rule received suggesting that USHEALTH had adopted ASC 606 and framing its effect as immaterial.[56] It reflected that the Company had elected to early adopt ASC 606, applying the retrospective approach as of January 1, 2019.[57] The memorandum identified three affected accounts: unearned association revenue liability, prepaid

---

[54] JX 27; JX 28.

[55] JX 27 at 6; JX 28 at 7.

[56] JX 27; Tr. 78:19−79:5 (Hunter); JX 58; Tr. 662:16−23 (Jacobs).

[57] JX 27 at 1; JX 58; Tr. 78:19−79:5, 109:15−112:7 (Downey); *id.* at 153:15−18 ("Q. [T]his bullet point indicated to you that USHEALTH was going to early adopt [ASC] 606? A. Yes."); *id.* at 181:19−24 (Schoettle); *id.* at 555:5−21 (Flemmons); *id.* at 292:4−293:2 (Easton); *id.* at 295:21−296:1 ("[T]he memo sort of highlights to me, okay, [ASC] 606 has been adopted. Now, going forward, I'm going to keep looking for what's the evidence, how's it going to be adopted, what are going to be the effects, et cetera.").

association bonus expenses, and retained earnings.[58]  It estimated an unearned association revenue liability of approximately $1.8 million, a prepaid association bonus asset of approximately $1 million, and an $800,000 net reduction to retained earnings.[59]

On January 15, 2019, based on USHEALTH's representation that ASC 606 involved "very immaterial timing adjustments" primarily related to association dues and fee revenue, the Revenue Recognition Memo, and an estimate of ASC 606's impact, Golden Rule's team closed out its ASC 606 diligence request.[60]  Golden Rule did so based on its understanding that USHEALTH had adopted ASC 606 and that the impact was immaterial.

### 3. The later financial materials

Later materials reinforced Golden Rule's understanding that USHEALTH had adopted ASC 606 and that the impact was immaterial.  These included internal files,

---

[58] JX 27 at 5; JX 58 at 6; Tr. 112:3−113:4 (Downey) ("[T]he unearned association revenue liability . . . would be a liability on the [C]ompany's balance sheet reflecting a portion of association revenue that had been received but not yet earned.  The prepaid association bonus expense asset would be a current asset on the [C]ompany's balance sheet and relate to the costs associated with that revenue.  [*i.e.*,] the costs the[] [Company] [would] have to pay out to their associates as a bonus.  . . . [W]hen the [C]ompany . . . adopt[s] a new standard, [it would] make an adjustment that nets off the balance sheet impact . . . and that adjustment or that difference floats through retained earnings.").

[59] JX 27 at 5; JX 58 at 6; Tr. 114:1−16 (Downey).

[60] JX 27 at 5; JX 28; JX 36 at SRS00006382; JX 55 at 1; Tr. 23:17−19, 25:5−15 (Hunter); *id.* at 23:18−22 ("I took away that, effectively, the impact at [*sic*] September 30, 2018, would be a $1.8 million liability, a $1 million revenue in the form of the prepaid expense resulting in a roughly $800,000 negative impact to retained earnings.").

audited and unaudited financial statements, consolidated financial results, and an audit report prepared by the external auditor. For example, Golden Rule relied on USHEALTH's audited 2018 financial statements, prepared by BDO USA, LLP ("BDO"), the Company's auditor, in April 2019 (the "Audited 2018 Financial Statements").[61] Those statements referenced ASC 606 and stated that its adoption was not expected to have a material impact on the Company's consolidated financial statements.[62] Koenig testified that the Audited 2018 Financial Statements reflected the Company's understanding at that time that ASC 606 would not have a material impact.[63]

On February 2, 2019, in response to a request from Golden Rule for additional information regarding the "*newly established* unearned premium balance," Koenig shared a spreadsheet showing the projected 2019 impact of ASC 606 on association

---

[61] JX 137 at 3 (comprising the balance sheets as of December 31, 2018 and 2017, and the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows for the years then ended, and the related notes to the consolidated financial statements); Tr. 114:17−19 (Downey); *see also id.* at 27:16−22 (Hunter) (describing audited financial statements as "hav[ing] been reviewed by an independent third-party audit firm and that the information presented is accurate and correct for the review and evaluation of that firm.").

[62] JX 137 at 13; Tr. 114:20−115:2 (Downey); *see also id.* at 29:12−23 (Hunter) (explaining that the inference was "[t]hat the accounting firm that reviewed and provided the audit had determined that the impact would not be material, based on their presumably accurate and correct understanding of the way that [ASC] 606 would apply to the business.").

[63] Tr. 636:3−19 (Koenig).

revenues.[64]  The schedule reinforced Golden Rule and PwC's "understanding that the [C]ompany had adopted [ASC] 606."[65]

The Company's consolidated GAAP financial results for January 1 through February 28, 2019 (the "February 2019 Financial Results") further confirmed that USHEALTH had opted for the early adoption of ASC 606.  A footnote stated that "ASC 606 *was implemented* as of January 1, 2019."[66]  Golden Rule and PwC understood the past-tense phrasing to mean that ASC 606 had been adopted beginning January 1, 2019.[67]  The footnote's quantitative discussion of the impact on assets, liabilities, and retained earnings aligned with the Revenue Recognition

---

[64] JX 70 (emphasis added); *id.* at SRS00048936; Tr. 120:13−17, 125:8−18 (Downey).

[65] Tr. 122:9−10 (Downey); *id.* at 570:22−571:6 (Flemmons).

[66] JX 94 at 3 (emphasis added); *see* Tr. 32:3−8 (Hunter).

[67] Tr. 32:16−24 (Hunter); JX 94 at 3; Tr. 123:19−22 (Downey); *id.* at 124:7−12 ("The past tense that the accounting standard was implemented, confirmed our understanding at the time that the company had, in fact, adopted [ASC] 606.  And had they not adopted [ASC] 606, it would have been unlikely that they would have provided, you know, such a footnote."); *id.* at 126:14−23 ("Q.  Did anything, or would anything in this February 2019 financial, suggest to you that the company was making an error correction in this financial under 605?  A.  No.  Q.  Why not?  A.  The reference at the very start of the footnote is to ASC 606.  And the accounts and the dollar amounts that are cited are, you know, in line and consistent with the[] [Revenue Recognition Memo]."); *id.* at 737:23−738:17 (O'Neill).

16

Memo's estimates.[68] Golden Rule and PwC inferred that USHEALTH had made corresponding journal entries to reflect ASC 606's adoption.[69]

As negotiations continued, USHEALTH provided unaudited consolidated financial statements for the four months ended April 30, 2019 (the "Unaudited Interim Period Financials"). Golden Rule reviewed those statements to test consistency between diligence materials and the period immediately before signing.[70] The Unaudited Interim Period Financials included a stockholders' equity line item labeled "Cumulative adjustment for new unearned revenue," further corroborating that the Company had adopted ASC 606 using the modified retrospective approach.[71]

Golden Rule also received BDO's April 18, 2019, audit wrap-up report (the "Audit Wrap-Up Report").[72] Around April 12, Koenig and her team had reviewed

---

[68] JX 94 at 3 ("The beginning of year impact was to increase pre-paid commissions (other assets) by $1.2 million, increase unearned revenue by $1.9 million (other liabilities) and decrease retained earnings by $.7 million."); Tr. 33:4−24 (Hunter); *id.* at 34:1−5 ("Q. Okay. Now, when you reviewed this, what was your reaction? Were you surprised? A. I was not surprised, as it was very consistent with the information we had seen to date on the same topic.").

[69] Tr. 124:13−125:4 (Downey); *see id.* at 301:14−306:17 (Easton) (explaining that a journal entry indicates adoption of the accounting standard and records the impact that such entry has on the financial statements).

[70] *Id.* at 128:3−9 (Downey).

[71] JX 159 at 4; Tr. 36:8−12 (Hunter); *id.* at 128:10−16 (Downey).

[72] JX 44 at 4−24; Tr. 567:18−20 (Flemmons).

and revised a draft of that report.[73]   The draft revisions changed the "Revenue Recognition" subsection of the "Adoption of New Accounting Standards" section to state that ASC 606 had been "[i]mplemented" in January 2019.[74]

In addition to the documentary evidence, Koenig had also repeatedly assured Golden Rule that ASC 606 had been adopted.[75]

### E.  The Transaction Economics and the Purchase Price Adjustment Structure

While diligence proceeded, the parties negotiated the Merger Agreement. Golden Rule's offer centered on two economic terms:  the base purchase price and the purchase price adjustment mechanisms.[76]

Golden Rule derived the $750 million base price (the "Base Price") using a discounted cash flow ("DCF") model.[77]  The DCF relied on 2019–2023 projections

---

[73] JX 116.

[74] *Id.* at 16; Tr. 568:2−6 (Flemmons); *see also id.* at 564:5−565:3 (unpersuasively opining that the use of the past tense should not lead a reader to infer that the Company had implemented ASC 606).

[75] Tr. 138:21−139:11 (Downey); *id.* at 178:2−10 (Schoettle).

[76] *Id.* at 38:17–20 (Hunter) ("The key deal terms certainly were the base price, the purchase price adjustment, . . . reps, warranties, covenants, indemnification provisions."); *id.* at 40:15−20 ("[T]he purchase price adjustment would be looking at . . . the final actual . . . relevant balance sheet or other financial statements and how those compare to the amounts that were estimated at closing and/or determined in accordance with the required minimums.").

[77] JX 87 at 15 ("The $750 million valuation in the Board financials is derived primarily from a DCF on the Integrated Case financials and a 15.3% required return."); Tr. 38:21−24; 39:4–11, 39:19–40:10 (Hunter); Saitz Dep. 138:8−13; *see* Bruer Dep. 85:16−19 ("United,

18

from the Company's income statement, which USHEALTH had provided during early diligence.[78]

The Merger Agreement also included purchase price adjustment mechanisms designed "to protect . . . both sides, but in particular [the] buyer, for changes in the business between [signing] and . . . closing."[79] The agreement contained two distinct purchase price adjustments: one for the Company's regulated entities, based on statutory capital, and the other for the Company's unregulated entities, based on tangible net worth.[80] These adjustments were calculated using financial information

from my experience, predominantly looks at discounted cash flow analyses, to understand a company's cash flows to support valuation work."); *see also* Dages Dep. 67:18−21 ("I believe[, if any valuation experts were asked,] they would all unanimously respond . . . that the best method for measuring a value or arriving at a value is a discounted cash flow analysis."); Tr. 388:3−7, 389:3−11 (Dages). Juli Saitz is a partner in the Forensic Advisory and Commercial Damages Practice of HKA Global, Inc., and served as SRS's rebuttal expert on Golden Rule's damages theory presented by Dages. JX 249 ¶¶ 1, 5. John Bruer was a senior associate on the M&A team at UHG. Kevin Dages is Executive Vice President of Compass Lexecon and served as Golden Rule's expert on the purchase price adjustment process. JX 246 ¶¶ 1, 10.

[78] Navin Dep. 32:19−20 ("Our forecast is mainly [based on the profit and loss statement], not balance sheet."); JX 87 at 6; JX 246 at 13 ¶ 23; *see also* Jacobs Dep. 33:3−16 (indicating that accountants use the terms profit and loss ("P&L") statement and income statement interchangeably); JX 132 at "Integrated DCF" tab (row 16) and "Integrated P&L" tab (row 32).Scott Navin was Vice President of Financial Planning & Analysis at USHEALTH. Navin Dep. 7:23–8:1.

[79] Tr. 134:8−11 (Downey); *see* Merger Agreement §§ 3.1, 3.4; *see also* Tr. 132:8−133:1 (Downey) (commenting on purchase price adjustment mechanisms being standard practice in deals); *id.* at 382:13−383:1 (Dages).

[80] Tr. 133:20−134:5 (Downey); *see id.* at 383:9−12 (Dages) ("In this case, the parties agreed on the tangible net worth adjustment that focused essentially just singularly on the

and supporting schedules exchanged during negotiations and later reflected in the estimated balance sheet. They formed the basis for calculating the final adjustment amount ("Final Adjustment Amount").[81]

The purchase price adjustment for USHEALTH's unregulated entities was the "Tangible Net Worth Adjustment." It measured the difference between the tangible net worth at closing (the "Tangible Net Worth") and a negotiated floor (the "Tangible Net Worth Minimum").[82] Golden Rule's expert witness, Kevin Dages,

---

association revenue strip of the total revenue stream."); *id.* at 393:10−21; JX 30 at 3 ("The net worth adjustment has the benefit of eliminating risk of underperformance to a buyer, avoiding a buyer discounting expected results over this period, and capturing a meaningful portion of the upside to a buyer from rolling forward its estimated valuation from the [December 31,] 2018 reference date to actual closing[.]").

[81] Merger Agreement § 1.1. The "Final Adjustment Amount" ("$P_{final}$") is calculated using the following formula:

$$P_{final} = P_{base} + (TNW - TNW_{minimum}) + SC + OC - TE - CI - T$$

Where:

$P_{base}$: Base Price

$TNW$: Actual Tangible Net Worth at Closing

$TNW_{minimum}$: Tangible Net Worth Minimum set at Signing

$SC$: Statutory Capital

$OC$: Operating Cash Adjustment

$TE$: Transaction Expenses

$CI$: Closing Indebtedness

$T$: Estimated Taxes Payable

[82] Merger Agreement § 1.1; Tr. 42:23−43:2 (Hunter) ("[T]he tangible net worth adjustment is comparing, again, the final actual tangible net worth, as defined, compared to the amount

explained that the calculation of the Tangible Net Worth Adjustment turned on balance sheet elements affected by ASC 606.[83]

The Tangible Net Worth was "designed to capture or reflect the financial condition and tangible net assets of USHEALTH's unregulated entities."[84] Under the Merger Agreement, the Tangible Net Worth was calculated as of the day immediately preceding the closing by subtracting total liabilities and intangible assets from total assets of the unregulated companies. The calculation had to be performed on a consolidated basis and in accordance with the accounting principles outlined in Annex A to the Merger Agreement (the "Accounting Principles").[85] Annex D provided an illustrative calculation assuming a December 31, 2018,

---

that was estimated at closing."); *id.* at 47:5−17 ("If the tangible net worth minimum is higher than the tangible net worth, it would be a negative adjustment to the final purchase price, so a reduction in the final purchase price. And, similarly, then, other side of the coin under the merger agreement, what happens if the tangible net worth minimum is lower than the tangible net worth? A. Yeah, then it would be a corresponding increase in the purchase price, yes."); JX 61; Tr. 136:6−11 (Downey).

[83] Tr. 400:22−401:24 (Dages); JX 246; *see* Tr. 383:9−12 (Dages) ("In this case, the parties agreed on the [T]angible [N]et [W]orth adjustment that focused essentially just singularly on the association revenue strip of the total revenue stream.").

[84] Tr. 42:17−20 (Hunter).

[85] Merger Agreement § 1.1; *id.* Annex A; *see also* Tr. 52:21−24 (Hunter) (stating that the negotiation of the Accounting Principles had begun in February 2019); JX 462 at 1; Tr. 715:5–18 (O'Neill) (describing the negotiation process behind the Accounting Principles).

closing.[86]    The Tangible Net Worth reflected in Annex D amounted to $48,742,000.[87]

Based on USHEALTH's financial statements and other information provided during negotiations, the parties set the Tangible Net Worth Minimum at $52 million.[88]   The Tangible Net Worth Minimum was intended to ensure that Golden Rule received a company with an appropriately capitalized balance sheet sufficient to support the future cash flows underlying Golden Rule's valuation.[89]

## F.    The Merger Agreement Provisions Relevant to the Claims

### 1.    Section 3.1(a):  Initial Merger Consideration

Section 3.1(a) of the Merger Agreement governed the determination of initial merger consideration.  No later than five business days before closing, USHEALTH was required to deliver to Golden Rule an estimated balance sheet ("Estimated Balance Sheet") prepared in accordance with the Accounting Principles and related

---

[86] Merger Agreement § 1.1; *id.* Annex D.

[87] *Id.* Annex D.

[88] Tr. 44:21−45:4 (Hunter); Merger Agreement § 1.1; Tr. 134:20−24, 151:19–152:10 (Downey); *see also id.* at 44:9−45:4 (Hunter) (noting that the parties reached the $52 million Tangible Net Worth Minimum based on an estimate of a projected balance sheet determined on the basis of the information provided by USHEALTH); *id.* at 43:21−24 (indicating that the parties started negotiating the tangible net worth minimum in January 2019); *id.* at 135:13−17 (Downey) (reporting the period of early February 2019 as the first time that Golden Rule proposed the amount of $52 million for the Tangible Net Worth Minimum); *id.* at 46:4−8 (Hunter) ("It was finally set at signing."); *id.* at 135:18−22, 137:13−138:16, 139:10−17 (Downey).

[89] Tr. 43:12−17 (Hunter).

good faith estimates of key financial metrics, including the Tangible Net Worth (the "Estimated Tangible Net Worth"), and a calculation of the Adjusted Initial Amount.[90] USHEALTH also agreed to consider, in good faith, any reasonable comments or questions regarding those estimates from Golden Rule before closing.[91]

To ensure consistency between the closing statements and the financial information provided to Golden Rule, the parties agreed that the Estimated Balance Sheet would be based on the most recently completed month-end consolidated balance sheet, plus adjustments to reflect estimated operating results through closing.[92] Despite USHEALTH's resistance, the parties also agreed that the Closing Balance Sheets and Tangible Net Worth would reflect the impact of ASC 606.[93]

---

[90] Merger Agreement § 3.1(a); *see* Tr. 42:5−10 (Hunter) ("Q. So what is an estimated balance sheet? A. Well, in this definition here, it's an estimated balance, so it's looking at the balance sheet that you expect to have at closing. It uses the prior month's end and then rolls forward to get to an estimate for the actual closing date that was defined."); *id.* at 48:21−49:1; JX 98; JX 99; Tr. 139:18−140:24 (Downey); *id.* at 756:22−759:10 (O'Neill).

[91] Merger Agreement § 3.1(a).

[92] *Id.* Annex A ¶ 3; *see* Tr. 55:11−56:24 (Hunter) (indicating that Golden Rule had insisted on the inclusion of this reference in the Accounting Principles); JX 462 at 5.

[93] Merger Agreement Annex A ¶ 5; *see* Tr. 49:21−50:8, 90:4−91:11 (Hunter); *id.* at 91:12−92:8 ("Q. And you testified on direct that Golden Rule insisted on having this language in the accounting policies; right? A. Correct, yes. Q. And that's because you-all wanted to be abundantly clear that [ASC] 606 would be applied in the closing balance sheets and tangible net worth; is that right? A. Yes. And the reason that's important, and I guess I had outlined, is because of the hierarchy in the order of operations, where, if we did not say that, it would default to 2018 audited -- like, 2018 audited kind of GAAP financial statements, which would not be subject to ASC 606. Q. So you specifically

23

## 2.    Section 3.4(b):  Post-closing adjustment process

Section 3.4(b) of the Merger Agreement established the post-closing procedure for determining the final balance sheet and the Final Adjustment Amount.[94]   Within 90 days after closing, Golden Rule had to deliver a final adjustment statement ("Final Adjustment Statement") comprising a balance sheet prepared as of the adjustment time and good-faith calculations of the relevant financial metrics, including the Tangible Net Worth.  The stockholder representative

called out [ASC] 606 for that reason?  A.  Yes.  Q.  To be abundantly clear to everyone that [ASC] 606 would apply to the closing balance sheets and tangible net worth; is that right?   A.   Yes.");  *id.*  at 759:24−760:11, 763:15−24 (O'Neill) (testifying that the Company's response to the proposed draft had been to strike out the part that referred to the application of ASC 606); *see also* JX 99; Tr. 141:16–142:11 (Downey) (testifying that throughout the whole due diligence process Golden Rule and PwC had no reason to doubt that the numbers provided by the Company were not reflective of the adoption of ASC 606, especially given the consistency of the documents with the Revenue Recognition Memo); *id.* at 145:11–20 ("Q.  Did you form a view as to why the company had proposed removing ASC 606 from the accounting principles?  A.  I did.  We had a phone call that I participated in with the members of the USHEALTH team and their attorneys and bankers.  And it was discussed why they had removed the [ASC] 606 language, and specifically, because the company -- their view was that because they had adopted [ASC] 606, it was unnecessary to have a specific policy stating that.");  *id.* at 144:13–19 (noting that the first draft USHEALTH shared included the reference to ASC 606); JX 196 at 17; Tr. 715:5−721:3 (O'Neill) (outlining the negotiation process and the reasons for the Company to reject the inclusion of a reference to ASC 606).  Golden Rule's representatives testified that they understood a "good faith estimate" to mean that "th[e] numbers [presented in the Estimated Balance Sheet] were correct and created in good faith."  *Id.* at 52:3−4 (Hunter); *see also id.* at 652:11−15 (Koenig) (asserting that Golden Rule was attempting to do the best good faith estimate).  Golden Rule likewise understood the Estimated Balance Sheet and the Estimated Tangible Net Worth indicated therein to reflect the impact of ASC 606, with the assumption and expectation that the application of ASC 606 had been done correctly.  *Id.* at 52:5−20 (Hunter); *id.* at 138:17−20 (Downey); *see also* JX 462 at 1, 5−6 (reflecting the negotiations surrounding the Estimated Balance Sheet in late February 2019).

[94] Merger Agreement § 3.4(b); Tr. 59:6−13 (Hunter).

then had 45 days to review the submission and raise objections. Any objections had to be set forth in a dispute notice identifying disputed items and the basis for disagreement.

If the parties could not resolve a timely dispute notice within 30 days, the disputed matters would be submitted to KPMG LLP ("KPMG") or another accounting firm of national reputation, which would be acting as an expert.[95] The expert's decision, absent fraud or manifest error, was final and binding.[96] The resulting balance sheet would constitute the final balance sheet (the "Final Balance Sheet").[97]

### 3. Section 4.5: Financial statement representations

Three days before signing, Golden Rule requested that the agreement include a representation and warranty in Section 4.5(a) to ensure that the financial statements it relied on during diligence accurately reflected the Company's condition and were prepared in accordance with GAAP.[98] USHEALTH represented that it had delivered audited consolidated financial statements for the years ending December 31, 2015,

---

[95] Merger Agreement § 3.4(b)(iv); Tr. 59:21−60:2 (Hunter).

[96] Merger Agreement § 3.4(b)(vii).

[97] *Id.* § 3.4(b)(viii).

[98] *Id.* § 4.5; Tr. 29:24−30:4 (Hunter); *id.* at 34:19−22 ("Q. So what was the purpose of these financial statements? A. To give a current and up-to-date view of the financial condition of the business."); *id.* at 93:13–16 ("[T]he words 'ASC 606' or 'Topic 606' do not show up. The concept of [ASC] 606 is absolutely included, though, in the GAAP reference to 2019.").

through December 31, 2018, and unaudited interim statements for the four months ending April 30, 2019.[99]  It further represented that those financial statements were prepared in accordance with GAAP, consistently applied, and fairly presented, in all material respects, the Company's financial condition and results of operations as of the relevant dates and periods, except as disclosed.[100]  The interim statements were identified as unaudited, subject to normal year-end adjustments, and omitting footnotes.[101]

## G.    Signing, Bring-Down Diligence, and Closing

The parties executed the Merger Agreement on June 2, 2019 ("Signing").[102] At a July 24, 2019, dinner with UHG's Chief Executive Officer of Specialty Benefits, Jeremy Schoettle, Koenig confirmed that USHEALTH had implemented

---

[99] JX 155; JX 159; Merger Agreement § 4.5; Tr. 18:6−17 (Hunter); *id.* at 527:15−20 (Flemmons); *id.* at 632:7−18 (Koenig).

[100] JX 155; Merger Agreement § 4.5; Tr. 769:11−24 (O'Neill).

[101] JX 154; Merger Agreement § 4.5; *see* Tr. 131:16−18 (Downey) ("A normal year-end adjustment would typically be a true-up for some item that is being estimated throughout the course of a year."); *see also id.* at 338:18−20 (Easton); *id.* at 528:19−529:7 (Flemmons); *id.* at 132:4−7 (Downey) ("Q.  In your 20 years of experience, have you ever seen a company classify the adoption of a new accounting standard as a normal year-end adjustment?  A.  No, I have not."); *id.* at 338:8−9 (Easton) (referring to the adoption of a new accounting standard) ("It's by no means a normal year-end adjustment.").  Golden Rule requested the insertion of the reference to the interim period financial statements in this representation and warranty three days before the parties executed the Merger Agreement.  *Id.* at 770:1−11 (O'Neill); *id.* at 34:15−18 (Hunter); *id.* at 35:7−12 ("[I]t was very important to us to ensure that we have the most up-to-date picture of the financial condition of the company prior to signing the transaction and then also ensuring that we have this included in the rep and warranty for the financial statements.").

[102] PTO ¶ 5; Tr. 12:21−13:4, 17:3−9 (Hunter).

ASC 606 as of January 1, 2019, and that the standard had an immaterial impact on the Company's financial statements.[103]

After Signing, Golden Rule completed the bring-down due diligence.[104] Shortly before the August 31, 2019, closing date (the "Closing Date"), USHEALTH provided an opening balance sheet (the "Opening Balance Sheet").[105] That document asked whether the entity had revenue streams subject to ASC 606 and, if so, whether the entity had been accounting for that revenue under ASC 606 in 2019.[106] USHEALTH responded: "ASC 606 was adopted effective 1/1/2019 with respect to association revenues and related agent bonus expense of USHEALTH Advisors and USHEALTH Administrators."[107]

On the Closing Date, USHEALTH delivered the final Estimated Schedule required under Section 3.1(a) of the Merger Agreement.[108] The schedule reported

---

[103] Tr. 185:17−186:7, 210:22−211:4 (Schoettle). Koenig could not recall whether she made this statement. *Id.* at 650:7−652:2 (Koenig). The court finds Schoettle's testimony credible on this issue.

[104] *Id.* at 15:2−3 (Hunter); *id.* at 189:1−5 (Schoettle).

[105] JX 178; JX 179; Tr. 189:6−190:3 (Schoettle); *see generally id.* at 514:20−24 (Flemmons) ("A. An opening balance sheet is a balance sheet that is prepared in connection with acquisitions that reflect the financial condition of the acquired company at the time that it will be absorbed into the acquiring company.").

[106] JX 178 at SRS00004397.

[107] *Id.*; Tr. 190:19−191:10 (Schoettle); *id.* at 585:1−586:12 (Flemmons).

[108] JX 253 at "Annex E_Estimated Schedule" tab; Merger Agreement § 3.1(a); Tr. 638:9−639:1 (Koenig).

an Estimated Tangible Net Worth of $40,751,266.[109]   Based on that figure, the Estimated Tangible Net Worth Adjustment at closing was negative $11,248,734.35.[110]

The parties consummated the Merger on the Closing Date (the "Closing").[111]

## H.    The Post-Closing Discovery of the ASC 606 Error

After Closing, as part of the integration of USHEALTH into UHG, Koenig joined UHG and began working with Schoettle.[112]   During the first month after Closing, Koenig asked Schoettle for prior UHG materials concerning ASC 606 to use as a reference in preparing a presentation for senior management.[113]   On September 19, 2019, Schoettle sent Koenig an ASC 606 presentation prepared by HealthMarkets, another company that UHG acquired in 2018 (the "White Paper").[114]

The White Paper prompted Koenig to revisit USHEALTH's pre-Closing ASC 606 analysis.   After reviewing it, Koenig concluded that the Company had

---

[109] JX 253 at "Annex D_Estimated TNW" tab (row 53); JX 246 at 20 ¶ 38.

[110] JX 246 at 20 ¶ 38.

[111] PTO ¶ 8.

[112] Tr. 192:18−193:6 (Schoettle).

[113] *Id.* at 193:17−194:3.

[114] JX 223 at 161−177; Tr. 192:18−193:16, 194:17−195:6, 195:14−18 (Schoettle); *id.* at 606:15−22 (Koenig) (arguing that Schoettle was aware of the misapplication of ASC 606 before Koenig realized it) ("So, you know, when Jeremy Schoettle called me up and said, I believe you applied, you know, the -- you haven't applied ASC 606 correctly, then I asked him to send me -- well, I don't have time to recreate the wheel, you know, we're busy here with -- working on the post-closing balance sheet.  And I asked him to send me whatever information he had.").

misapplied ASC 606 in its pre-Closing financials.  The parties dispute when and by whom the misapplication was first identified, but it is clear that Koenig raised the issue in a September 25, 2019, email to Schoettle and Billy Jacobs, USHEALTH's Controller.[115]

For the first time, Koenig's email and attachments indicated that a correct application of ASC 606 would materially affect the Company's financial statements, contrary to prior representations.[116]  Golden Rule and USHEALTH then engaged in extensive discussions concerning the revised calculations and their implications for the Tangible Net Worth.[117]

Golden Rule's internal communications reported that "Koenig . . . agreed and confirmed that [ASC 606] was not correctly accounted for in the pre-[Closing] financials and that the change ha[d] no economic impact."[118]  But correctly applying

---

[115] JX 184; Tr. 196:2−8 (Schoettle).

[116] Tr. 196:18−21 (Schoettle); *see also id.* at 196:9−13 ("Q.  And what was the effect of the corrected [ASC] 606 analysis on the [C]ompany's balance sheet?  A.  Yeah.  It was a change of about $30 million on her estimate."); *id.* at 197:1–4 ("I was surprised that it had materially changed because basically the last ten months or so, since last November, it was considered immaterial.  So I was a little surprised by the material change.").

[117] JX 194 at 1; *see, e.g.,* Tr. 148:11−21 (Downey); *see also id.* at 721:6−723:8 (O'Neill) (recounting a meeting with Koenig and Schoettle at which Koenig presented them with the revised calculations and downplayed the significance of the revision); *id.* at 241:17−243:5 (Bruer).

[118] JX 202 at 1; Tr. 246:8−17 (Bruer).

ASC 606 produced a materially different Tangible Net Worth Adjustment of approximately $38.3 million.[119]

## I. The Purchase Price Adjustment Dispute

On January 7, 2020, SRS delivered a dispute notice to Golden Rule under Section 3.4(b)(ii) of the Merger Agreement.[120] On February 7, 2020, Golden Rule sent SRS a written notice under Section 9.4(a) of the Merger Agreement (the "Claim Notice"), seeking indemnification related to USHEALTH's treatment of ASC 606

---

[119] Tr. 196:9−13 (Schoettle); *id.* at 248:2−19 (Bruer); *id.* at 149:4−19 (Downey); *id.* at 394:20–395:5 (Dages); *id.* at 341:9−10 (Easton) ("In fact, the adoption [of ASC 606] did have a material impact."); *id.* at 637:8−13 (Koenig); *id.* at 240:15−21 (Bruer) ("Q. Did you see anything unusual in that review? A. In that review I saw that the [T]angible [N]et [W]orth presented in the final closing statements was massively higher than what I had ever seen before in my time within corporate development, so yes, I did see something unusual in those final statements."); *id.* at 241:1−8 ("[I]t was close to double what was in the estimate, and typically in an estimated statement, it would be a relatively close approximation of what I would have expected to see in the final statements, given our circling the same date, and so it was very odd to me to see the final statements were so much larger, particularly on tangible net worth."); *id.* at 691:11−13 (Jacobs); *id.* at 401:4−11 (Dages) ("Q. Why is [ASC] 606 important or relevant to your conclusion in this case? A. Because the fact that [ASC] 606 is driving and that the tangible net worth calculation is very focused on just the entity that is affected by the [ASC] 606 calculation, that -- if the [ASC] 606 calculation is done correctly or not done correctly, that has an impact on where you set the peg or the minimum."); *id.* at 402:10−12 ("[T]he [ASC] 606 application is what drove the tangible net worth delta. And so it's a key component of the calculation.").

[120] PTO ¶ 11.

30

and its effect on the Tangible Net Worth calculation.[121] SRS responded on April 20, 2020.[122]

On May 18, 2020, Golden Rule filed a verified complaint in a prior action (the "Prior Action") seeking a declaration and injunction to prevent SRS from asking KPMG to determine the Final Adjustment Amount using an application of ASC 606 different from the one used in the Company's pre-closing financial statements.[123] Golden Rule argued that the court, rather than KPMG, should decide the contract construction issue concerning the application of ASC 606. On January 29, 2021, the court granted SRS's motion to dismiss the Prior Action.[124] In dismissing the Prior Action, the court held that "[u]nder the language of the Agreement, consistency with past practices cannot justify a concededly incorrect application of ASC 606." *Golden Rule Fin. Corp. v. S'holder Representative Servs. LLC*, 2021 WL 305741, at \*12 (Del. Ch. Jan. 29, 2021), *aff'd*, 267 A.3d 382 (Del. 2021). In its affirmance, the Delaware Supreme Court agreed.[125] On January 25, 2023, Golden Rule paid the

---

[121] *Id.* ¶ 12.

[122] *Id.*

[123] *Id.* ¶ 14. Verified Complaint, *Golden Rule Fin. Corp. v. S'holder Representative Servs. LLC*, C.A. No. 2020-0378-PAF (Del. Ch. May 18, 2020).

[124] *Golden Rule Fin. Corp. v. S'holder Representative Servs. LLC*, 2021 WL 305741 (Del. Ch. Jan. 29, 2021).

[125] *Golden Rule Fin. Corp. v. S'holder Representative Servs. LLC*, 267 A.3d 382 (Del. 2021) (ORDER) ("The plain language of the Agreement supports an application of the correct application of ASC 606. Golden Rule's position would, in substance, read ASC 606 out of the agreement.").

Final Adjustment Amount in the amount of $40,164,358.82, calculated using a correct application of ASC 606.[126]

### J. Procedural History

On February 25, 2021, Golden Rule sent SRS a Renewed Notice of Claims seeking indemnification related to USHEALTH's treatment of ASC 606 and its effect on the Tangible Net Worth calculation.[127] Golden Rule commenced this action on January 20, 2022.[128] The verified complaint originally asserted three counts.[129] The parties have resolved Count III, leaving Count I and Count II for resolution.[130] Count I asserts breach of the representations and warranties in Section 4.5 of the Merger Agreement. Count II asserts breach of covenants and obligations under Sections 3.1 and 3.5 of the Merger Agreement. Plaintiff seeks specific performance requiring indemnification or, alternatively, damages.

The parties tried the case over three days, presented post-trial briefing, oral argument, and supplemental briefing.[131]

---

[126] JX 297.

[127] PTO ¶ 16.

[128] Dkt. 1.

[129] *See id.* ¶¶ 89−111.

[130] Pl.'s Pre-Trial Br. 32 n.4.

[131] Dkts. 143, 145−147, 164.

## II.    ANALYSIS

### A.    Breach of Contract

To prevail on its breach of contract claim, Plaintiff must establish by a preponderance of the evidence: "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Williams v. Hall*, 2026 WL 35922, at *3 (Del. Jan. 6, 2026) (quoting *R.I. Off. of Gen. Treasurer ex rel. Empls.' Ret. Sys. of R.I. v. Paramount Glob.*, 331 A.3d 179, 190 (Del. Ch. 2025)). The parties agree that the Merger Agreement is a valid contract.[132] The issues for the court revolve around the second and third elements of Plaintiff's claim.

"The proper construction of any contract . . . is purely a question of law." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). Delaware courts "adhere[] to the 'objective' theory of contracts, *i.e.*, a

---

[132] PTO ¶ 34.

contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citation modified). The court must read the contract "as a whole and enforce the plain meaning of clear and unambiguous language." *Manti Hldgs., LLC v. Authentix Acq. Co.*, 261 A.3d 1199, 1208 (Del. 2021); *see also Johnson & Johnson v. Fortis Advisors LLC*, 352 A.3d 229, 265 (Del. 2026) ("Delaware law instructs courts to evaluate the contract as a whole and to give effect to all its provisions.") (citation modified).

If the contractual language is clear, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (citation modified). Contractual language is clear "[w]hen the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation." *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008).

If a contract's language is ambiguous, then the court must look to other sources to determine what an objectively reasonable third party would have understood the parties' intent to be. *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834–35 (Del. Ch. 2007). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is

ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc*, 616 A.2d at 1196. Nor is a contract unambiguous simply because both sides contend that its meaning is plain. *See Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847 n.68 (Del. 2019) (explaining that "whether a contract is unambiguous is a question of law; this Court cannot find an ambiguous contract unambiguous because each party interprets the contract differently to find it unambiguous").

Instead, ambiguity exists if "the provisions in controversy are fairly susceptible of different interpretations." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). "The determination of ambiguity lies within the sole province of the court." *Osborn*, 991 A.2d at 1160. "[T]he introduction of extrinsic, parol evidence does not alter or deviate from Delaware's adherence to the objective theory of contracts;" rather, "the extrinsic evidence may render an ambiguous contract clear so that an 'objectively reasonable party in the position of either bargainer would have understood the nature of the contractual rights and duties to be.'" *United Rentals*, 937 A.2d at 835 (quoting *U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *10 (Del. Ch. June 6, 1996)).

Before reaching the merits of the Plaintiff's claim, the court addresses Defendant's contention that the claims are barred under the principles of *res judicata* and the terms of the Merger Agreement.

**B.    Is the Claim Barred Under the Doctrine of *Res Judicata*?**

Defendant contends that Plaintiff's indemnification claim is barred under the doctrine of *res judicata*.[133]   Defendant argues that Golden Rule could have, and should have, asserted its indemnification claim at the time it asserted its declaratory judgment claim.  Because Golden Rule failed to do so, Defendant insists that the claims are barred.  Golden Rule argues that its claim is not barred because, at the time of the first action, the claim was not ripe.[134]

The doctrine of *res judicata* bars a party from "bringing a second suit based on the same cause of action after a judgment has been entered in a prior suit involving the same parties."  *Betts v. Townsends*, 765 A.2d 531, 534 (Del. 2000); *see also Vaughn v. Allstate Prop. & Cas. Ins. Co.*, 351 A.3d 974 (Del. 2025) (ORDER) ("*Res judicata* bars a court or administrative agency from reconsidering conclusions of law previously adjudicated while collateral estoppel bars relitigation of issues of fact previously adjudicated." (citation modified)).  As the Delaware Supreme Court held, "[t]o protect both judicial economy and the interests of

---

[133] Def.'s Answering Br. 1, 29−32.

[134] Pl.'s Opening Br. 56−57; Pl.'s Reply Br. 31−32.

defendants in avoiding a multiplicity of actions, *res judicata* precludes plaintiffs from splitting claims and seeking the same relief in subsequent litigation under a different substantive theory." *Goode v. Goode*, 350 A.3d 1226 (Del. 2025) (ORDER) (citation modified). "As an initial matter, *res judicata* only applies to successive litigations, not within the same case." *Id.* (citation modified). The second action is prohibited if: (1) the court that adjudicated the first action had jurisdiction over the subject matter and the parties; (2) the parties to the first action were the same as those parties, or in privity, in the case at bar; (3) the first action or the issues decided in that case were the same as the case at bar; (4) the issues in the prior action must have been decided adversely to the plaintiff in the case at bar; and (5) the decree in the prior action was a final decree. *Dover Hist. Soc'y v. City of Dover Plan. Comm'n*, 902 A.2d 1084, 1092 (Del. 2006); *accord Yarborough v. Taylor*, 351 A.3d 1002 n.7 (Del. 2025) (ORDER). The first, second, fourth, and fifth elements are satisfied in this case. The parties' dispute centers on the third element.

Delaware has adopted a "transactional" approach to claim preclusion. *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 193 (Del. 2009). Under this rubric, "litigation between the same parties [is barred] if the claims in the later litigation arose from the same transaction that forms the basis of the previous adjudication." *Kossol v. Ashton Condo. Ass'n, Inc.*, 637 A.2d 827 (Del. 1994) (ORDER). "Determining whether two claims arise from the same transaction

37

requires pragmatic consideration, with the [court] 'giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *LaPoint*, 970 A.2d at 193 (quoting Restatement (Second) of Judgments § 24(2) (1982)). If the claims asserted in the two actions are "derived from a common nucleus of operative facts," then they "arise from the same transaction." *Id*. at 193 (citation modified) (quoting *Maldonado v. Flynn*, 417 A.2d 378, 383 (Del. Ch. 1980)). This is so, regardless of whether the "substantive theory of recovery asserted by [the plaintiff] in the two courts is different." *Maldonado*, 417 A.2d at 382.

But even if the defendant can establish that the claims are transactionally identical, it must also "show that the plaintiff 'neglected or failed to assert claims which in fairness should have been asserted in the first action.'" *LaPoint*, 970 A.2d at 193−94 (quoting *Kossol*, 637 A.2d at 827). "*[R]es judicata* applies to all claims that were litigated or *which could have been litigated* in the earlier proceeding." *Keynetics S'holder Tr. v. Keynetics Inc.*, 350 A.3d 638 n.54 (Del. 2025) (ORDER) (emphasis in original) (citation modified). The fairness inquiry is not restricted merely to the question of whether the claim "could have been brought." *Grunstein v. Silva*, 2014 WL 4473641, at *41 n.319 (Del. Ch. Sept. 5, 2014), *aff'd sub nom., Dwyer v. Silva*, 113 A.3d 1080 (Del. 2015); *see Maldonado*, 417 A.2d at 382

38

(observing that a claim deemed to be "transactionally" identical that was not asserted in the prior action "must be dismissed . . . unless there was a valid reason for the splitting" of the claim).

If the later filed action was unripe at the time of the first action, *res judicata* will not bar the second claim. *LaPoint* is controlling. *LaPoint* involved an action for breach of contract, which was litigated in this court, followed by a second breach of contract action in the Superior Court. Both actions asserted claims for breach of the same contract. In the first action, the plaintiffs alleged the defendant breached a merger agreement, including by failing to properly calculate contractually defined earnout payments. 970 A.2d at 188–89. In the pretrial order, the plaintiffs indicated their intent to seek an equitable award of their attorneys' fees as part of their damages, but ultimately did not present evidence on the issue at trial. After obtaining a $21 million judgment in this court, the plaintiffs demanded indemnification from the defendant under the indemnification provision of the merger agreement.[135] When the defendant refused the demand, the plaintiffs filed an indemnification action in the Superior Court requesting attorneys' fees incurred in the first action. The defendant moved for summary judgment, arguing that *res judicata* barred the

---

[135] The contract required the buyer to "indemnify [the plaintiffs] from and against any and *all Damages incurred* in connection with, arising out of, resulting from or incident to any *breach* of any covenant, representation, warranty or agreement made by [defendant] in this [Merger] Agreement." *LaPoint*, 970 A.2d at 190. The merger agreement defined "Damages" to include "reasonable attorneys' fees." *Id*.

indemnification claim because the first and second actions arose out of the same contract. The trial court agreed.

In reversing the trial court, the Delaware Supreme Court acknowledged the general proposition that "a contract is considered to be a single 'transaction' for the purpose of claim preclusion." *Id.* The Court explained: "Contractual rights that are triggered and pursued after the initial action is filed, however, are not barred by *res judicata* because a prior judgment 'cannot be given the effect of extinguishing claims which did not even then exist.'" *Id.* (quoting *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955)). In *LaPoint*, the Court held that *res judicata* did not bar the subsequent indemnification action, even though it arose out of the same contract that gave rise to the first action, because the indemnification claim did not ripen until the final adjudication of its breach of contract claim.[136] Plaintiff argues that *LaPoint* is directly on point here.

Defendant attempts to distinguish *LaPoint* as limited to its facts. Specifically, Defendant argues that the indemnification claim in *LaPoint* was not ripe under the specific language of the indemnification provision in that case. Defendant focuses on the procedural mechanisms in the Merger Agreement in this case for making an indemnification claim. Under that provision, if a party sends an indemnification

---

[136] The trial court also granted summary judgment for the defendant on statute of limitations grounds. The Supreme Court also reversed on that issue. *LaPoint*, 970 A.2d at 198.

40

notice, and the parties have not resolved the dispute within 60 days following receipt of the Claim Notice, then either party "may seek legal redress."[137] Defendant argues that after Golden Rule sent its February 7, 2020, indemnification claim notice, it had a legal right to bring an indemnification action 60 days thereafter. Because Golden Rule did not include an indemnification claim in the first action, Defendant contends that this indemnification action is barred by *res judicata*.

Defendant's argument is unconvincing. First, merely because the contract theoretically allowed Golden Rule to bring an indemnification action 60 days after it sent its notice does not mean that Golden Rule had a ripe claim to bring at that time. Indeed, Defendant itself specifically said so when it responded to Golden Rule's Claim Notice on April 20, 2020:

> As an initial matter, the Claim Notice is premature. [Golden Rule] has not suffered any Loss (indemnifiable or otherwise) because [SRS] has not yet prevailed on the Parties' dispute regarding the Final Adjustment Statement. Nonetheless, we write to provide reasonable detail regarding what the Stockholder Representative's response would be should the Claims become ripe.[138]

---

[137] *See* Merger Agreement § 9.4(a). Section 9.4(a) provides that the Securityholders shall indemnify the Parent Indemnified Parties for "any and all costs, losses, damages, Liabilities . . . and reasonable fees and expenses . . . incurred, sustained or suffered by them" that are "attributable to, resulting from or arising out of" "any breach of, or inaccuracy in, any of the representations or warranties of the Company contained in Article IV." *Id.* Section 1.1 defines "Liability" or "Liabilities" to include "any debts, liabilities, commitments or obligations, of any kind and description, whether accrued or unaccrued, liquidated or unliquidated, absolute or contingent." *Id.* § 1.1.

[138] JX 219 at 1−2.

At the time of the first action, Golden Rule's indemnification claim was not ripe. If Golden Rule had won the first action, it would not have incurred a Loss giving rise to an indemnification claim. In a 180-degree turn from its April 20, 2020, letter to Golden Rule, Defendant now claims that Golden Rule should have brought a second claim in the first action seeking a declaratory judgment on its yet unripe indemnity claim.[139] But Defendant ignores two points of Delaware law: (1) "a trial court has discretion in determining whether to entertain a declaratory judgment action" and (2) "[t]he court may not exercise that discretion . . . unless the action presents an 'actual controversy.'" *XL Specialty Ins. Co. v. WMI Liquid. Tr.*, 93 A.3d 1208, 1216 (Del. 2014) (quoting *Gannett Co., Inc. v. Bd. of Managers of the Del. Crim. Just. Info. Sys.*, 840 A.2d 1232, 1237 (Del. 2003)). There was no actual controversy over Golden Rule's claim for indemnity until there was a final order adjudicating the application of ASC 606 in calculating the Final Adjustment Amount. Had the court ruled in Golden Rule's favor on this issue in the first action, there would have been no basis for the indemnification claim. For the avoidance of doubt, I would not have exercised my discretion to entertain a declaratory judgment

---

[139] Defendant did not interject its *res judicata* defense until January 27, 2023, when it moved to file an amended answer. Dkt. 39. This was nearly three years after it told Plaintiff that a claim for indemnification was not ripe and a year after Plaintiff filed this action. *See* Dkt. 1. The court granted the motion to amend the answer, noting that "[t]his court rarely declines amendments under Rule 15(a) based on futility." Dkt. 75 at 29:9–18 (quoting *Twitter v. Musk*, 2022 WL 4087797, at *1 (Del. Ch. Sept. 7, 2022)).

claim for indemnification based upon the possibility that Golden Rule might not prevail on its claim pertaining to the application of ASC 606 in calculating the Final Adjustment Amount. And, in any event, having considered the evidence, the court concludes for the same reasons stated above that, even if the indemnification claim was ripe at the time of the first action, Defendant has not met its burden that Golden Rule "neglected or failed to assert [the indemnification] claim[] which in fairness should have been asserted in the first action." *LaPoint*, 970 A.2d at 193−94.

## C.     Is the Claim Barred Under the Indemnification Clause?

Defendant next argues that even if Plaintiff can satisfy the requirements for a breach of contract, its indemnification claim is contractually barred by Section 9.3(d), "Limitations to Indemnification" of the Merger Agreement. Section 9.3(d)(iii) provides:

> Any Loss for which any Indemnified Party is entitled to indemnification under this Article IX shall be determined without duplication of any amounts or state of facts reflected on the Final Adjustment Statement or taken into consideration in determining the Final Adjustment Amount (and the individual elements included therein for the calculation of the Adjusted Initial Amount or the Final Adjustment Amount, as applicable) or recovery by reason of the state of facts giving rise to such Loss constituting a breach of more than one representation, warranty, covenant or agreement.[140]

This late-blooming argument, which was not raised until the submission of the pretrial stipulation and order, reads Section 9.3(d)(iii) as a broad "no-two-bites-

---

[140] Merger Agreement § 9.3(d)(iii).

43

at-the-apple" provision.[141]  In Defendant's reading, once the parties completed the post-closing true-up, litigated the proper application of ASC 606 in the Prior Action, and incorporated the outcome of that ruling into the Final Adjustment Statement, Plaintiff could no longer pursue *any* indemnification claim relating in any way to the same $38.3 million accounting impact.  On this reading, Section 9.3(d)(iii) precludes not only duplicative *recovery* but also any duplicative *claim* over a "state of facts" that was "reflected on the Final Adjustment Statement or taken into consideration in determining the Final Adjustment Amount."[142]

Golden Rule responds that Section 9.3(d)(iii) functions as a classic anti-duplication rule:  it prevents an indemnified party from recovering twice for the same economic harm—once through the purchase price adjustment mechanisms and again through indemnification.[143]  On Golden Rule's reading, the references to "amounts or state of facts" and to the Final Adjustment Statement and Final Adjustment Amount simply ensure that any *correction* already given effect through the true-up cannot be recaptured in damages, and clause (iii) prevents the same "state of facts" from generating multiple overlapping recoveries under different representations and covenants.

---

[141] Def.'s Answering Br. 33−35; Def.'s Opening Suppl. Br. 12−17; Def.'s Reply Suppl. Br. 3−5.

[142] Def.'s Answering Br. 24, 33−35.

[143] Pl.'s Opening Br. 57−60; Pl.'s Reply Br. 32−33.

The text and structure of Article IX of the Merger Agreement support Plaintiff's reading. "Loss" is defined broadly to include "any and all costs, losses, [and] damages" attributable to breaches of the Company's representations, warranties, and covenants.[144] Section 9.3(d) then sets out a series of limitations on the measurement of that Loss.[145] Each subsection of Section 9.3(d) limits how a Loss is calculated and recovered, not which types of claims may be brought. "Any Loss . . . shall be determined without duplication" of (i) amounts or state of facts already embedded in the Final Adjustment Statement or Final Adjustment Amount, or (ii) recovery where the same state of facts breaches more than one provision.[146]

By contrast, the Merger Agreement addresses re-litigation of the true-up dispute elsewhere. Section 3.4(b)(vii) states that the independent accounting firm's resolution of the parties' purchase price adjustment dispute "shall be final and binding upon [the parties] . . . [and] no party shall seek further recourse to courts, other tribunals or otherwise."[147] That provision, not Section 9.3(d)(iii), is the parties' express "no further recourse" clause for the post-closing adjustment process. Reading Section 9.3(d)(iii) to impose a universal bar on any subsequent litigation with any relationship to the true-up would risk rendering Section 3.4(b)(vii)

---

[144] Merger Agreement § 9.2.

[145] *Id.* § 9.3(d).

[146] *Id.* § 9.3(d)(iii).

[147] *Id.* § 3.4(b)(vii).

surplusage, contrary to settled principles of contract interpretation. *See Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage."); *accord In re Aearo Techs. LLC*, 346 A.3d 584, 605 n.25 (Del. 2025); *see also Osborn*, 991 A.2d at 1159 ("We will not read a contract to render a provision or term meaningless or illusory.") (citation modified).

Defendant's reading would also produce untenable results. If "any . . . state of facts reflected on the Final Adjustment Statement or taken into consideration in determining the Final Adjustment Amount" were enough to bar subsequent indemnification, any breach flowing through the Estimated Balance Sheet and Final Adjustment Statement would effectively be insulated from post-closing recourse. Because the purchase price adjustment is calculated using financial statement line items, nearly every financial-statement irregularity that affects the statement would be captured under the "state of facts" considered in determining the Final Adjustment Amount. That would substantially erode the protection afforded by the Company's financial statement representations and the indemnity that backs them. Delaware courts reject unreasonable contract interpretations. "An interpretation is unreasonable if it produces an absurd result or a result that no reasonable person

46

would have accepted when entering the contract." *Manti*, 261 A.3d at 1208; *accord LGM Hldgs., LLC v. Schurder*, 340 A.3d 1134, 1144 (Del. 2025).

The market evidence the parties submitted also supports Plaintiff's reading. The model no-duplication clause in American Jurisprudence Legal Forms, which Defendant also cites, precludes "duplication of recovery by reason of the state of facts giving rise to such damages constituting a breach of more than one representation, warranty or covenant."[148] That language is materially similar to the second half of Section 9.3(d)(iii).[149] It is designed to prevent double *recovery* for the same state of facts, not to bar a later claim entirely. Other model agreements cited by Golden Rule use the same "state of facts" formulation to avoid double recovery when a single factual scenario breaches multiple provisions.[150] *See, e.g.*, Par Petroleum Corp/Co, Environmental Agreement, 6 Model Agrmts for Corp. Couns. § 47:14 (Jan. 2025). The parties here went further and added a reference to "amounts or state of facts reflected on the Final Adjustment Statement or taken into consideration in determining the Final Adjustment Amount," but nothing in the

---

[148] 9B Am. Jur. Legal Forms 2d § 142:88:50 (2025) ("Any damages for which any person is entitled to indemnification under this [article or section] shall be determined without duplication of recovery by reason of the state of facts giving rise to such damages constituting a breach of more than one representation, warranty or covenant . . . ").

[149] *Compare id.*, *with* Merger Agreement § 9.3(d)(iii).

[150] Pl.'s Suppl. Answering Br. 19.

model language suggests that such wording is understood in the market to operate as a global bar on any follow-on claim about the same subject matter.

Defendant argues that *Impact Investments Colorado II, LLC v. Impact Holding, Inc.*, 2012 WL 3792993 (Del. Ch. Aug. 31, 2012), compels a different outcome. In that case, the parties disputed how certain assets should be treated in the calculation of working capital during the true-up process, "expressly negotiated over these items, and reached agreement." *Id.* at \*12. The court held that, under a provision barring indemnification for claims or liabilities "taken into account in determining any adjustment of the [p]urchase [p]rice," the buyer could not seek indemnification later to reverse those negotiated items, because doing so would render the purchase price adjustment "a moot exercise." *Id.* at \*2, \*12.

*Impact Investments* is distinguishable. There, the disputed items had been explicitly negotiated and resolved into the final purchase price adjustment, and the buyer's indemnification claim sought to undo that negotiated resolution. Here, there is no evidence that the parties ever "expressly negotiated" or "settled" Plaintiff's indemnification theory—namely, that USHEALTH's pre-closing misapplication of ASC 606 caused the parties to set an artificially low Tangible Net Worth Minimum, thereby distorting the true-up process from the outset. The Prior Action resolved a different question: whether, under the Accounting Principles, the Final Adjustment Statement had to reflect ASC 606 correctly under GAAP or consistently with the

Company's historical practice. This court held that the Final Adjustment Statement must "reflect the impact of the requirements of ASC 606, regardless of how it was previously implemented." *Golden Rule*, 2021 WL 305741, at *13. The consequence was that Golden Rule had to pay the $38.3 million adjustment.

The question in this case is different. Plaintiff does not seek to reopen how ASC 606 must be applied in the Final Adjustment Statement or to avoid the $38.3 million upward adjustment that flowed from the prior decision. Plaintiff instead seeks indemnification for USHEALTH's breaches of its financial statement representation and covenants before Closing. According to Plaintiff, these breaches caused the parties to agree to a Tangible Net Worth Minimum that did not fairly reflect the Company's financial condition under a proper application of ASC 606. As Golden Rule emphasizes, the "state of facts" at issue here is that the Tangible Net Worth Minimum was set using materially misstated pre-Closing financials, thereby altering the dollar-for-dollar true-up framework. That "state of facts" was neither "taken into consideration" in the prior true-up dispute nor resolved in the prior opinion, which expressly noted that Golden Rule could "resort to indemnification and sue for a breach of representations and warranties." *Golden Rule*, 2021 WL 305741, at *8.

Thus, because Section 9.3(d)(iii) is an anti-duplication provision, and because Plaintiff's indemnification claim does not seek to duplicate any Loss already

corrected through the true-up process or any recovery already obtained, that provision does not bar the claim. Given that conclusion, the court need not address the Plaintiff's waiver argument.

**D.    Did SRS Breach the Contract?**

Under Article IX, Defendant agreed to indemnify Golden Rule for Losses arising from USHEALTH's breaches of its representations, warranties, and covenants. Golden Rule contends it suffered Losses due to the Company's breach of three provisions of the Merger Agreement. Those provisions are: Section 4.5(a), governing the Company's financial statements; Section 3.1(a), governing the Estimated Balance Sheet and Estimated Tangible Net Worth; and Section 3.5, governing the preparation of the Final Adjustment Statement and Final Adjustment Amount.

**1.    Section 4.5(a) of the Merger Agreement**

Section 4.5(a) of the Merger Agreement contains USHEALTH's "Financial Statements" representation:

Section 4.5(a) of the Company [d]isclosure [s]chedules contains (i) the audited annual consolidated financial statements of the Company and its [s]ubsidiaries as of and for the year ended December 31, 2015, 2016, 2017 and 2018 (each, an "Annual Period"), consisting of an audited consolidated balance sheet, statements of income, stockholders' equity and cash flows of the Company and its [s]ubsidiaries for each Annual Period, and (ii) the unaudited consolidated financial statements of the Company and its [s]ubsidiaries as of and for the four-month period ended April 30, 2019 (the "Interim Period"), consisting of an unaudited consolidated balance sheet, statements of income and stockholders'

50

equity of the Company and its [s]ubsidiaries for the Interim Period (collectively, the "GAAP Financial Statements"). ***The GAAP Financial Statements*** were prepared in accordance with GAAP, consistently applied, and, except as set forth in Section 4.5(a) of the Company [d]isclosure [s]chedule, ***fairly present, in all material respects in accordance therewith, the financial condition and results of operations of the Company*** and its [s]ubsidiaries at their respective dates, and the results of operations of the Company and its [s]ubsidiaries at and for the periods indicated, except, in the case of the financial statements referenced in clause (ii) above, for the absence of footnotes and that such financial statements are subject to normal year-end adjustments.[151]

As the Delaware Supreme Court explained in *RAA Management, LLC v. Savage Sports Holdings, Inc.*,

> [i]f there is a public policy interest in truthfulness, then that interest applies with more force, not less, to contractual representations of fact. Contractually binding, written representations of fact ought to be the most reliable of representations, and a law intolerant of fraud should abhor parties that make such representations knowing they are false.

45 A.3d 107, 117 (Del. 2012). USHEALTH's unregulated business generated material revenues from association dues and related bonus expenses. Those revenues were subject to ASC 606. The Company prepared and shared with Golden Rule and its advisers the Revenue Recognition Memo, which analyzed the impact of ASC 606 and estimated the resulting unearned association revenue liability, prepaid association bonus asset, and retained earnings adjustment. Its external auditor issued the Audited 2018 Financial Statements, stating that the adoption of ASC 606 was

---

[151] Merger Agreement § 4.5(a) (emphasis added).

not expected to have a material impact on the Company's consolidated financial statements. The February 2019 Financial Results, the Unaudited Interim Period Financials, the Audit Wrap-Up Report, and the Opening Balance Sheet all described ASC 606 as having been "implemented" as of January 1, 2019, and conveyed that the impact of that adoption had been booked.

In fact, USHEALTH had not correctly applied ASC 606 in its pre-closing financial statements. When the Company's financials were recomputed using a proper ASC 606 methodology, the impact on the unregulated entities' balance sheet—and thus on the Tangible Net Worth—was significant. Koenig acknowledged that ASC 606 "was not correctly accounted for in the pre-[Closing] financials."[152] The resulting $38.3 million difference in Tangible Net Worth is irreconcilable with a representation that the prior financial statements fairly presented the Company's financial condition in all material respects and complied with GAAP.[153]

---

[152] JX 202 at 1; Tr. 246:8−17 (Bruer).

[153] *See* Robert J. Haft, Arthur F. Haft & Michele Haft Hudson, *"Present Fairly"—A requirement additional to GAAP compliance?*, Due Diligence–Per Rep & Sec Offer § 6:39 (2025) ("'[F]airly presents' is not limited merely to conformity with GAAP. . . . '[T]he critical test was whether the financial statements as a whole fairly presented the financial position of [the company] . . . If they d[o] not, the basic issue bec[o]me[s] whether defendants acted in good faith.' Proof of compliance with generally accepted standards [i]s deemed . . . 'evidence which may be very persuasive but not necessarily conclusive that he acted in good faith, and that the facts as certified were not materially false or misleading.'") (quoting *United States v. Simon*, 425 F.2d 796, 805–06 (2d Cir. 1969)) (citation modified).

USHEALTH's post-closing efforts to recast this record are unpersuasive. To support the argument that the Company had not adopted ASC 606, Koenig and other USHEALTH representatives rely on the Company's history of never early adopting an accounting standard.[154] To strengthen the indication that the Company had not early adopted ASC 606, Koenig and Patrick O'Neill, USHEALTH's former Vice President and General Counsel, further refer to the standard procedure for adopting a new accounting standard, which contemplated drafting a final adoption memorandum, an audit review, a presentation to the board, and the board's final adoption.[155] Koenig said she could not recall if she had represented to Schoettle that the Company had early adopted ASC 606 or that the application of ASC 606 was immaterial to the Company's financial statements.[156] O'Neill testified that the Company would never have agreed to make such a representation because it would not have been true.[157] Those self-serving denials are inconsistent with the

[154] Tr. 615:8−10 (Koenig); *id.* at 739:12−16, 746:19−24 (O'Neill).

[155] *Id.* at 614:15−615:10, 621:1−622:2 (Koenig); *id.* at 740:23−743:6 (O'Neill) (noting that no policy, memorandum, note, or email outlines the process to adopt ASC 606 early); *see also id.* at 747:1−749:16, 751:4−18.

[156] *Id.* at 651:15−652:2 (Koenig). *Compare id.* at 669:6−14 (Jacobs) (stating that the Company had not early adopted ASC 606), *with* JX 108 (reflecting an exchange between Koenig and Jacobs about the impact of ASC 606 using the past tense).

[157] Tr. 720:7−20 (O'Neill); *see id.* at 685:11−686:3 (Jacobs) (referring to the language in JX 179 at GRFC000179470) ("Q. This comment says that ASC 606 was adopted effective 1/1/2019 with respect to association revenues and related agent bonus expense of

53

contemporaneous evidence presented at trial, specifically the Company's own edits to the audit materials, the language of the documents directed to Golden Rule, and PwC's contemporaneous understanding. Perhaps the two least credible theses the Company advanced are that "ASC 606" was used as a shorthand for ASC 605 and that the references to ASC 606 were mere typographical errors.[158] Repeatedly

USHEALTH advisors and USHEALTH administrators. Do you see that? A. Yes. Well, we hadn't adopted. We didn't early adopt 606. Q. So that was an inaccurate statement? A. Again, we hadn't adopted [ASC] 606 formally. Q. That wasn't my question. I asked whether that was an inaccurate statement because this says it was adopted, effective January 1, 2019. A. I don't really have an opinion on the statement. I'm just telling you that we hadn't early adopted.").

[158] *Id.* at 618:1−3 (Koenig) ("Q. So you called it [ASC] 606 for shorthand? A. Yes."). *Compare id.* at 625:6−12, *with id.* at 175:1−4 (Schoettle) ("Q. And in your experience, do accountants or CFOs ever refer to [ASC] 605 as [ASC] 606 for shorthand? A. Never, no."); *id.* at 574:22−575:13 (Flemmons) ("Q. And, sir, you're aware of Ms. Koenig's testimony that ASC 606 was used here as a shorthand for ASC 605; isn't that right? A. I recall that. Q. And, sir, in your time working at the SEC, you are not aware of even a single instance where a company used one GAAP standard as shorthand for another GAAP standard; isn't that right? A. I'm not sure I've heard that expression before, no. Q. Sir, never in your time as an auditor do you recall a company using one GAAP standard as shorthand for another GAAP standard? A. Same answer, I've not heard that reference. Q. Never in your years as a testifying expert do you recall a company using one GAAP standard as shorthand for another GAAP standard; isn't that right? A. That's correct."); *see id.* at 629:14−631:1 (Koenig) (referring to JX 116 at 12) ("Q. Now, notice the heading here is 'Adoption of New Accounting Standards.' And immediately below it, it says, 'Revenue Recognition,' and the first statement is 'The FASB's broad-reaching new revenue recognition standard is effective for private companies for annual periods beginning after December 31, [2000]' -- and do you see here that '19 is crossed out and '18 is inserted? A. Yes. Q. The company was telling BDO that the appropriate application standard was for annual periods beginning after December 31, 2018, not December 31, 2019; correct? A. That is the correction that's made. And that's a correct correction. Because after 2018, the first annual period after 2018 is 2019. Q. And the next phrase says, 'and interim reporting periods within annual reporting periods beginning after

writing "606" in documents specifically about the "new standard" and its effect is not plausibly explained as casual shorthand or accidental typos. As the Delaware Supreme Court noted in *Salamone v. Gorman*, 106 A.3d 354, 366 n.36 (Del. 2014), "[a]fter-the-fact testimony . . . [is] not . . . as credible as contemporaneous documentary evidence." (quoting *In re Westech Cap. Corp.*, 2014 WL 2211612, at *6 n.39 (Del. Ch. May 29, 2014)); *see also Restanca, LLC v. House of Lithium, Ltd.*, 2023 WL 4306074, at *19 (Del. Ch. June 30, 2023) ("Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985)), *aff'd*, 328 A.3d 328 (Del. 2024).

The Company's representatives also attempt to shift the responsibility to Golden Rule, suggesting that financial due diligence should have detected the error.[159] That weak argument blurs the line between deal-related financial due diligence and an audit. PwC's mandate was to evaluate the information that the Company provided and advise Golden Rule about the associated risks, not to

---

December 15 ..., and, similarly, 2019 is crossed out and 2018 is inserted. Do you see that? A. Yes, but that's incorrect. Q. And so that was incorrect information that you and Mr. Jacobs provided to your auditor? A. Right. [] It was -- it was a typo. It was a -- we converted one to -- you know, it was being parallel, but that's incorrect. Q. And this information was something that both you and Mr. Jacobs reviewed -- A. Right. Q. -- and approved sending to your auditor? A. That's correct. It was an oversight.").

[159] *See, e.g.*, Tr. 67:1–78:18 (Hunter).

perform a full ASC 606 audit.[160]   PwC was entitled to rely on USHEALTH's

representations about its adoption of ASC 606 and its effect on the financial

statements.   As this court articulated in *Cobalt Operating, LLC v. James Crystal*

*Enterprises, LLC*,

> [d]ue diligence is expensive and parties to contracts in the mergers and
> acquisitions arena often negotiate for contractual representations that
> minimize a buyer's need to verify every minute aspect of a seller's
> business.   In other words, representations like the ones made in [the
> agreement] serve an important risk allocation function.   By obtaining

---

[160] *Id.* at 105:18−20 (Downey) ("Q.   Are you doing anything like an audit when you perform financial due diligence?   A.   No.   We are not."); *id.* at 115:6−117:5 ("Q.   And I want to get in a little bit more to this concept of diligence.   Did you do an independent assessment of the [C]ompany's analysis of [ASC] 606?   A.   No, we did not.   That was not part of our scope of work.   Q.   And why not?   Why didn't you perform that work?   A. Yeah.   As I articulated earlier, the scope of diligence is much different than an audit or, in this case, a full assessment of ASC 606 would have required a lot more time and effort than what we were scoped to do.   Q.   And what kind of review would have been required, in your experience, to be able to fully audit or assess the [C]ompany's description of [ASC] 606 as applied to the business?   A.   Yeah.   A full assessment would have required review of all the customer -- the [C]ompany's customer contracts and detailed discussions with management specific to those contracts.   Q.   Did you perform an assessment of whether, in your view, the [C]ompany's assessment was reasonable?   A.   Yeah.   By virtue of obtaining the memo and developing and understanding that they had reviewed the appropriate guidance, had referenced the appropriate guidance in their assessment, you know, we had reasonable -- or had a reasonable conclusion that the [C]ompany had done the assessment appropriately.   Q.   And, again, in your 20 years of experience and the hundreds of deals that you've done, generally speaking, is that consistent with what you do on other matters when there's the adoption of a new accounting standard that is represented to be immaterial?   A.   That's correct.   Q.   If the [C]ompany had disclosed to you whether, in the [Revenue Recognition Memo] or in the audited financials, that ASC 606 would have a material effect, not an immaterial one, what would that have done to your diligence?   A. Yes.   That would have changed how we would have approached the [ASC] 606 diligence and we would have sought to understand from the [C]ompany, you know, what revenue stream, what particular contracts, what customers, et cetera, are leading them to the conclusion of a material impact."); *see also id.* at 111:15−115:5 (expanding on the inferences drawn from the documents provided during due diligence).

the representations it did, [the buyer] placed the risk that [the seller's] financial statements were false and that [the seller] was operating in an illegal manner on [the seller]. Its need then, as a practical business matter, to independently verify those things was lessened because it had the assurance of legal recourse against [the seller] in the event the representations turned out to be false . . .

2007 WL 2142926, at *28 (Del. Ch. July 20, 2007), *aff'd*, 945 A.2d 594 (Del. 2008); *accord Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *76 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018) (ORDER). The Merger Agreement does not condition Golden Rule's indemnification rights on whether it could have determined that Defendant's contractual representations and warranties were false prior to closing. In fact, it provides just the opposite, confirming that Golden Rule's indemnification right "shall not be affected" by "any investigation conducted," "information received," or "knowledge acquired (or capable of being received or acquired) at any time" regarding "the accuracy of or compliance with any of the representations, warranties, covenants or agreements set forth" in the Merger Agreement.[161]

The court concludes that USHEALTH misapplied ASC 606 in its pre-Closing financial statements and that it represented to Golden Rule that ASC 606 had been implemented as of January 1, 2019, with an immaterial impact. USHEALTH

---

[161] Merger Agreement § 9.8.

breached Section 4.5(a), and SRS, as the stockholder representative, is liable for that breach under Article IX.

## 2. Section 3.1(a) of the Merger Agreement

Golden Rule contends that USHEALTH breached Section 3.1(a) of the Merger Agreement by failing to provide an Estimated Balance Sheet prepared in accordance with the Accounting Principles and an Estimated Schedule reflecting "good faith" estimates of USHEALTH's resulting calculations.

Section 3.1(a) required USHEALTH, no later than five business days before closing, to deliver two sets of materials to Golden Rule. First, USHEALTH had to deliver a "statement setting forth an estimated balance sheet of the Company as of the Adjustment Time prepared in accordance with the Accounting Principles" – defined as the "Estimated Balance Sheet." Second, USHEALTH had to deliver "a schedule in the format specified on Annex E" – defined as the "Estimated Schedule." The Estimated Schedule had to show "in reasonable detail, [USHEALTH's] good faith estimates of the Tangible Net Worth, the Tangible Net Worth Adjustment, the Statutory Capital, the Statutory Capital Adjustment, the Operating Cash, the Operating Cash Adjustment, the Transaction Expenses, the Closing Indebtedness, and the Taxes Payable."[162]

---

[162] Merger Agreement § 3.1(a).

The provision thus imposed both an accounting compliance requirement and an estimation requirement. The Estimated Balance Sheet had to be prepared in accordance with the Accounting Principles. The Accounting Principles in Annex A state that the Closing Balance Sheet and Tangible Net Worth "will reflect the impact of the requirements of . . . [ASC] 606." The Estimated Schedule then had to show, in reasonable detail, good faith estimates of the Company's calculations based on those inputs.

The Estimated Schedule that USHEALTH delivered on August 31, 2019, reported an Estimated Tangible Net Worth of $40,751,266, leading to an initial negative Tangible Net Worth Adjustment of approximately $11.25 million. It is undisputed that this estimate did not reflect a correct application of ASC 606. That error was not merely an inaccurate prediction; it reflected a failure to correctly apply the governing revenue recognition standard to material revenue streams in the unregulated business. Because the Estimated Balance Sheet had to be prepared in accordance with the Accounting Principles, and because those principles required the impact of ASC 606 to be reflected in Tangible Net Worth, USHEALTH's failure to apply ASC 606 correctly meant that the delivered estimates did not comply with Section 3.1(a). The reference to the concept of a "good faith estimate" does not excuse that noncompliance. Reading the good faith language to permit an estimate that disregarded or misapplied the contractually required Accounting Principles

59

would deprive the separate accounting compliance requirement of independent effect. A good faith estimate may prove inaccurate. But Section 3.1(a) did not permit USHEALTH to prepare the estimate using accounting principles other than those set forth in Annex A.

To be sure, Section 3.1(a) is inapposite to the stock purchase agreement provision that this court analyzed in *ArchKey Intermediate Holdings Inc. v. Mona*, 302 A.3d 975 (Del. Ch. 2023), which imposed on the seller the obligation to "*prepare[] in good faith* and in accordance with GAAP and consistent with the past practices of the [c]ompany" an adjusted closing balance sheet. *Id*. at 1000 (emphasis in original). There, the contract required the seller to draft one document and to do so "in good faith," "in accordance with GAAP," *and* "consistent with the past practices." By contrast, Section 3.1(a) created a dual structure that distinctly articulated the requirements for preparing the Estimated Balance Sheet and the Estimated Schedule. The good-faith estimates pertained only to the Estimated Schedule, whereas there was a firm requirement that the Estimated Balance Sheet be prepared in accordance with Accounting Principles.

USHEALTH failed to satisfy the accounting compliance requirement in Section 3.1(a). Therefore, the court need not decide whether USHEALTH acted in subjective bad faith when preparing the estimates. USHEALTH's failure to prepare

the Estimated Balance Sheet and related Tangible Net Worth calculation in accordance with the Accounting Principles is sufficient to establish a breach.

USHEALTH breached Section 3.1(a) of the Merger Agreement, and the breach is indemnifiable under Article IX.

### 3. Section 3.5 of the Merger Agreement

Section 3.5 required the Company to prepare the Final Adjustment Statement and the Final Adjustment Amount using the same accounting principles, policies, and methods used in preparing the Estimated Balance Sheet and the illustrative Tangible Net Worth calculation in Annex D, except as otherwise expressly provided.

The claim under Section 3.5 is largely duplicative of the financial statement breaches already addressed. Once the parties agreed that ASC 606 would govern the calculation of the Tangible Net Worth, USHEALTH was obliged to apply the Accounting Principles consistently in preparing both its estimates and the statements used in the purchase price adjustment process. *See Golden Rule*, 2021 WL 305741, at *5 (holding that the Accounting Principles "unambiguously require[d] the correct application of ASC 606."); *id.* at *10 (the Accounting Principles require "that ASC 606 [] be correctly applied" and the "actual compliance with ASC 606").

USHEALTH's failure to apply ASC 606 correctly in the pre-closing financials and in the Estimated Balance Sheet necessarily meant that the starting point for the Final Adjustment Statement was distorted.

Yet the core of Golden Rule's claim lies in Section 4.5(a) and Section 3.1(a) of the Merger Agreement. Whether Section 3.5 adds a separate breach does not affect the outcome. Under Section 9.3(d)(iii), Golden Rule is entitled to a single recovery for its Losses arising from this state of facts, not multiple overlapping awards. Therefore, the damages analysis will focus on the proven breaches of Sections 4.5(a) and 3.1(a).

## E.    Did Golden Rule Establish Damages?

"Under Delaware law, the standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*." *NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *17 (Del. Ch. Aug. 2, 2023) (citation modified) (citing *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1130 (Del. 2015)). "It is a basic principle of contract law that remedy for a breach should seek to give the nonbreaching party the benefit of its bargain by putting that party in the position it would have been but for the breach." *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000).

> Th[e] principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract. Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost.

*Siga Techs.*, 132 A.3d at 1130 (quoting *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001)). "[E]xpectation damages must be proven with reasonable

certainty, and 'no recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative.'" *Id.* at 1131 (quoting *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 351 n.99 (Del. 2013)). "Where the injured party has proven the *fact* of damages—meaning that there would have been some profits from the contract—less certainty is required of the proof establishing the *amount* of damages." *Id.* at 1131 (emphasis in original). As articulated in *Cura Financial Services N.V. v. Electronic Payment Exchange, Inc.*, "[u]nder the prevailing law, [the plaintiff] must present 'sufficient evidence to provide a reasonable basis for the [fact finder] to estimate with a fair degree of certainty his probable loss.'" 2001 WL 1334188, at *19 (Del. Ch. Oct. 22, 2001) (quoting *Moody v. Nationwide Mut. Ins. Co.*, 549 A.2d 291, 293 (Del. 1988)). "Reasonable certainty is not equivalent to absolute certainty; rather, the requirement that plaintiff show defendant's breach to be the cause of his injury with 'reasonable certainty' merely means that the fact of damages must be taken out of the realm of speculation." *Id.* at *20 (quoting *Tanner v. Exxon Corp.*, 1981 WL 191389, at *1 (Del. Super. July 23, 1981)).

SRS must indemnify Golden Rule for "any and all costs, losses, damages, liabilities and expenses" that are "attributable to, resulting from or arising out of"

63

any breach of the Company's representations, warranties, or covenants.[163] The definition of "Loss" is broad and unqualified. Nothing in Article IX narrows it to out-of-pocket costs or excludes the type of expectancy harm Golden Rule claims here.

Given the implications of the correct application of ASC 606, a key area of focus for the parties has been Golden Rule's valuation methodology and the relevance of the revenue recognition accounting standard.[164] The Base Price of $750 million was determined using a DCF analysis, which measures value by reference to projected cash flows.[165] Thus, the correct application of ASC 606 did not change the cash receipts or projected cash flows underlying Golden Rule's DCF, and therefore would not have changed the $750 million Base Price.[166] The Tangible Net Worth calculation served a different function. It was not relevant for the valuation methodology used to set the Base Price; it was a closing balance sheet-

---

[163] Merger Agreement § 9.2(a).

[164] *See, e.g.*, Tr. 159:12−160:3 (Downey).

[165] *Id.* at 21:21−22:10 (Hunter); *id.* at 404:9−11 (Dages).

[166] *Id.* at 83:5−9 (Hunter) ("Q. Mr. Hunter, during your direct examination, you testified that [ASC] 606 does not impact the value of a company from [UHG]'s perspective; is that correct? A. That's correct."); *id.* at 384:15−24 (Dages) ("[T]he ASC 606 adjustment is strictly an accounting adjustment. It does not reflect in any way a change in cash flows or projected cash flows. As a result, it has -- whether it's done correctly or incorrectly, it has no impact on the $750 million handshake agreement on the [B]ase [P]rice of this business because it has absolutely no impact on the cash flows that are part of the DCF model that we'll look at that drive this business. And there's no disagreement among the experts with regard to that whatsoever."); *see also id.* at 391:3−6, 402:19–403:7.

driven metric used in the purchase price adjustment mechanism.[167]  Because the Tangible Net Worth was calculated by reference to the assets and liabilities of USHEALTH's unregulated entities, the correct application of ASC 606 materially affected that calculation, which in turn materially affected the Final Adjustment Amount.[168]

Golden Rule's damage theory does not contend that the Company's enterprise value changes when ASC 606 is correctly applied in the Final Adjustment Statement. Rather, it asserts that USHEALTH's pre-closing misapplication of ASC 606 caused the parties to set a Tangible Net Worth Minimum that materially understated the Company's tangible net assets at closing.  Because the Tangible Net Worth Minimum was set using financial statements that failed to apply ASC 606 correctly,

---

[167] *Id.* at 405:18–406:8, 456:11–13 (Dages).

[168] *See generally* JX 247 ¶¶ 92−94 (illustrative example of a comparison between the application of [ASC] 605 and [ASC] 606 in the expert report by Easton); Tr. 286:15−287:16 (Easton) (discussing the impact of [ASC] 605 and [ASC] 606 on the income statement and the balance sheet) ("It's important to note that cash receipts are exactly the same.  Nothing's happened to affect the cash.  The cash is still received at the end of each of the three years, or the way the example is set up, accounted for at the end of the three years.  But then now what's important is the balance sheet.  So in the balance sheet now, we record a contract asset at the beginning of the year the first year, the beginning of the year when that service was provided.  In other words, the performance obligation was complete.  So that amount is a contract asset of 1080, which recognizes that a revenue going forward in the year one, two, and three would total 1080.  We've got an asset to recognize that revenue which we would receive later.  Associated with that is the contract liability, which is the bonus expense that will have to be paid to the people who sold the contracts.  These are unique terms to [ASC] 606.  This term 'contract asset' is first used in [ASC] 606, as is 'contract liability.'  And then, important to true up the statement of changes in equity, we've got an adjustment to accumulated retained earnings of 360.").

the dollar-for-dollar true-up mechanism operated on a distorted baseline. When ASC 606 was eventually applied correctly, the mis-set Tangible Net Worth Minimum forced Golden Rule to pay an additional $38.3 million that it would not have paid had the Company complied with its contractual obligations. This circumstance makes this case distinguishable from this court's rejection of the plaintiff's damages theory in *NetApp*, which was based on projected theoretical synergies that were unsupported by tangible facts in the record and was not limited to the harm proximately caused by the acquired company's fraud and breaches of contract. 2023 WL 4925910, at *23. By contrast, here, the damages amount is certain, as it is the $38.3 million ultimately paid by Golden Rule as a result of USHEALTH's breaches. In other words, it is not the result of any valuation by either an expert or the court.

Similarly, Defendant's attempt to analogize the present circumstances to the facts addressed in *Glidepath Ltd. v. Beumer Corp.*, 2019 WL 855660 (Del. Ch. Feb. 21, 2019), does not change the outcome here. In *Glidepath*, the court addressed the measure of damages for multiple proven breaches of an operating agreement. The buyer had breached the agreement in three respects, including by extending unauthorized loans to the target company without obtaining the seller's consent and by failing to provide draft annual financial statements as required. Despite establishing those breaches, the plaintiffs failed to demonstrate that either violation

66

caused them any actual harm or resulted in compensable damages. The plaintiffs'

principal theory—that they could have extracted concessions had they been

consulted—was unsupported by the evidentiary record and contradicted their own

conduct. *Id*. at *23. This court therefore awarded only nominal damages for those

breaches, emphasizing that the existence of a contractual violation does not, by itself,

entitle a plaintiff to a compensatory recovery. *Id*. By contrast, here, the *quantum* of

damages that Defendant's breaches caused is easily identified in the $38.3 million

true-up payment Golden Rule had to make following the correction of the error.

Had ASC 606 been applied correctly prior to Closing, Plaintiff would have

been able to negotiate the Merger Agreement's key financial terms based on a

complete picture of the Company's financial condition. Although it is only more

likely than not that Plaintiff would have proposed a higher Tangible Net Worth

Minimum, the precise outcome of that negotiation is necessarily unknowable.[169] To

this end, the court is not required to reconstruct with mathematical precision the

exact agreement the parties would have reached. *See Maverick Therapeutics, Inc.

v. Harpoon Therapeutics, Inc.*, 2021 WL 1592473, at *10 (Del. Ch. Apr. 23, 2021)

("The fact of damages must be proven with reasonable certainty, but mathematical

certainty is not required." (citation modified)); *id.* ("[S]o long as a plaintiff provides

---

[169] *See generally* JX 249 ¶ 44.

a reasonable method to calculate damages, the risk that such cannot be determined with mathematical certitude falls on the wrongdoer, not the wronged." (quoting *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 948513, at *20 (Del. Ch. Feb. 27, 2020)).

When a seller's misrepresentations or covenant breaches cause a buyer to pay more than it would have paid had the agreement been performed as promised, the resulting overpayment is a cognizable loss. The indemnification provision here is fully consistent with that approach.

Golden Rule proved its Loss. Through its expert, Kevin Dages, it quantifies the economic effect of correcting USHEALTH's ASC 606 error on the Tangible Net Worth Adjustment. Dages compared (i) the Tangible Net Worth and corresponding adjustment calculated using USHEALTH's pre-closing misapplication of ASC 606 with (ii) the Tangible Net Worth and adjustment calculated using a correct application of ASC 606 consistent with the Accounting Principles. The difference between those two calculations is approximately $38.3 million. The record contains no competing damages analysis that credibly undermines Dages's methodology or conclusions.

SRS responds that Golden Rule suffered no Loss because, after ASC 606 was correctly applied, Golden Rule received a company with higher tangible net worth, and the Merger Agreement valued each dollar of Tangible Net Worth at one dollar

of purchase price. On SRS's framing, Golden Rule simply paid what it had agreed to pay for the assets it received and cannot complain about the outcome of a bargained-for true-up mechanism.

That argument elides the role of the Tangible Net Worth Minimum and the purpose of the adjustment framework. Golden Rule did not agree in the abstract to pay "one dollar for every dollar of tangible net worth" at closing. It agreed to that formula on the premise that the Tangible Net Worth Minimum itself would be set using GAAP-compliant financial statements, including a proper application of ASC 606 in the pre-closing period, so that the true-up would measure changes between signing and closing rather than embed pre-existing value that should have been reflected in the Base Price or in a properly set Tangible Net Worth Minimum. Once the Tangible Net Worth Minimum is understood in that light, the economic harm becomes clear: because the Tangible Net Worth Minimum was artificially low, the later correction of ASC 606 in the Final Adjustment Statement translated into an inflated upward adjustment, and thus an overpayment, of $38.3 million.

SRS also suggests that any attempt to reconstruct what the parties would have done had ASC 606 been applied correctly before closing is too speculative to support damages. It points out that negotiations are iterative and that, had Golden Rule insisted on raising the Tangible Net Worth Minimum, the sellers might have demanded a higher Base Price or other concessions. That kind of hindsight

renegotiation scenario is not the test. The Merger Agreement contains a fixed $750 million Base Price, a $52 million Tangible Net Worth Minimum, and financial statement representations and covenants that the Company did not satisfy. Golden Rule proved by a preponderance of the evidence that, had USHEALTH applied ASC 606 correctly in the pre-signing and interim period, the parties would have set a materially higher Tangible Net Worth Minimum and thereby avoided the full $38.3 million upward adjustment that Golden Rule ultimately paid. Delaware law does not require mathematical precision in quantifying such harm; reasonable certainty is sufficient, and Golden Rule has met that standard.

Article IX requires that Losses be determined "without duplication of any amounts or state of facts reflected on the Final Adjustment Statement or taken into consideration in determining the Final Adjustment Amount" or recovery where the same state of facts breaches more than one contractual provision. Golden Rule has not received any prior recovery for the $38.3 million increase in merger consideration, and this decision awards that amount only once for a single state of facts. The damages awarded, therefore, comply with the contractual no-duplication requirement.

Golden Rule has established an indemnifiable Loss in the amount of $38.3 million.

## F. Interest

"In Delaware, prejudgment interest is awarded as a matter of right, not by judicial discretion." *LG Elecs. Inc. v. Invention Inv. Fund I, L.P.*, 2026 WL 935618, at \*16 (Del. Apr. 7, 2026). "Prejudgment interest serves two purposes"—one compensatory and one restitutionary. *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011). "[F]irst, [prejudgment interest] compensates the plaintiff for the loss of the use of his or her money; and, second, it forces the defendant to relinquish any benefit that it has received by retaining the plaintiff's money in the interim." *Id.*

"In the absence of an express contract rate, Delaware courts use the 'legal rate' as a default rate." *In re Bremerton Cellular Tel. Co. Litig.*, 328 A.3d 330, 353 (Del. Ch. 2024) (citation omitted). Under Delaware law, the legal rate of interest is five percentage points above the federal discount rate. 6 *Del. C.* § 2301(a). "Section 2301(a) defines 'the legal rate of interest' as the Federal Reserve discount rate plus 5 percent '*as of the time from which interest is due.*'" *Noranda Aluminum Hldg. Corp. v. XL Ins. Am., Inc.*, 269 A.3d 974, 979 (Del. 2021) (emphasis in original).

"Typically, the 'judgment' in civil actions—as in this case—consists of the factfinder's award of damages, the costs assessed by the court, and prejudgment interest." *NGL Energy P'rs LP v. LCT Cap., LLC*, 319 A.3d 335, 341 (Del. 2024).

"Section 2301(a) unambiguously requires that post-judgment interest accrue at the legal rate that was in effect on the date of judgment." *Noranda*, 269 A.3d at 979.

"A court of equity [] has broad discretion, subject to principles of fairness, in fixing the rate [of pre-judgment interest] to be applied, and in the Court of Chancery the legal rate is a mere guide, not the inflexible rule." *Energy Transfer, LP v. Williams Cos., Inc.*, 346 A.3d 1089, 1120 (Del. 2023) (citation modified); *see ITG Brands, LLC v. Reynolds Am., Inc.*, 2025 WL 670818, at *13 (Del. Ch. Mar. 3, 2025) ("Modern Delaware law typically applies compound interest. The interval of compounding is discretionary. But quarterly compounding is common.") (citation modified), *aff'd*, 351 A.3d 519 (Del. 2025).

The parties do not dispute that Plaintiff is entitled to pre- and post-judgment interest.[170] Therefore, the court awards Plaintiff prejudgment and post-judgment interest at the legal rate, compounded quarterly.

### G. Attorneys' Fees

"Delaware generally follows the American Rule, under which litigants are responsible for their own attorneys' fees, regardless of the outcome of the lawsuit." *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 280 (Del. 2022) (quoting *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 417 (Del. 2010)). There are exceptions to the American Rule. One exception "is found in contract litigation that involves a

---

[170] Pl.'s Opening Br. 61; Post-Trial Arg. at 110:18–20.

fee shifting provision." *Id.* (quoting *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007)). If a contract contains a fee-shifting provision, Delaware courts will enforce it. *SIGA Techs.*, 67 A.3d at 352.

Under Section 9.2(a)(i) and (ii) of the Merger Agreement, SRS is required to indemnify Golden Rule for

> reasonable fees and expenses (including reasonable legal . . . fees and expenses) in connection with any . . . damages incurred . . . attributable to, resulting from or arising out of . . . any breach of, or inaccuracy in, any of the representations or warranties of the Company contained in Article IV . . . [and] the breach of any covenant, undertaking, agreement or other obligation of the Company contained in th[e] [Merger] Agreement.[171]

Defendant does not contest the Plaintiff's entitlement to attorneys' fees and costs if it prevails in the litigation. Because Plaintiff has prevailed in the litigation, it is entitled to recover its reasonable attorneys' fees, expenses, and costs.

## III. CONCLUSION

Golden Rule's indemnification claim is not barred by *res judicata* or by limitations set forth in Article IX of the Merger Agreement. USHEALTH breached its financial statement representation in Section 4.5(a) and its obligations under Section 3.1(a), and SRS is liable for those breaches under the Merger Agreement's indemnification provisions. Golden Rule has established an indemnifiable Loss in the amount of $38.3 million, plus prejudgment interest at the legal rate from the date

---

[171] Merger Agreement § 9.2(a)(i)–(ii).

it paid the additional consideration attributable to the Final Adjustment Amount through the date of judgment, compounded quarterly. Plaintiff is entitled to its reasonable attorneys' fees, expenses, and costs incurred in this litigation.

The parties shall confer and submit, within ten days, a proposed form of implementing order consistent with this decision. If the parties are unable to agree on a form of order, they shall instead submit competing forms, accompanied by a joint letter identifying the points of disagreement.